ARDYCE I. SCHWARTING, APPELLEE, V. HENRY OGRAM, APPELLANT.

FILED APRIL 8, 1932. No. 28159.

Kirkpatrick, Good & Dougherty, for appellant.

Max V. Beghtol, Glen H. Foe, J. L. Rankin and John Riddell, contra.

Heard before GOSS, C. J., ROSE, DEAN, GOOD, EBERLY, DAY and PAINE, JJ.

PAINE, J.

This is a personal injury action, resulting from a collision of motor vehicles, brought on behalf of a minor, by her father and next friend, against Henry Ogram, defendant and appellant. The jury returned a verdict for the plaintiff. The motion for new trial being overruled, the judgment is brought to this court on appeal.

The accident occurred about 11:30 p. m., July 19, 1930, about four miles south of York, Nebraska, upon the Meridian highway, also known as U. S. Highway No. 81. This highway, at the place where the accident occurred, is about 30 feet wide, with a graveled surface.

Ardyce I. Schwarting, a schoolgirl, about 16 years of age, was riding in the rear seat of a 1925 Overland sedan with two other girls, while her mother was with her father in the front seat. They were returning to their home at McCool Junction from York; and driving south. The night was dark, and the air filled with dust by reason of the heavy traffic along this highway at that time. A 2½-ton Hawkeye truck, belonging to the appellant, was going north, en route from Concordia, Kansas, to Fremont, Nebraska, with a load of household goods. The truck was driven by Frank Vittera, and his helper, Wade

Rice, was riding with him. The truck at that time was not running upon any regular or fixed route, but was running on what is called a special order, under which the driver of the truck was permitted to take any direct route between Concordia, Kansas, and Fremont, Nebraska.

The negligence charged in the petition against the owner of the truck was that the truck was being operated at a rate of speed greater than was reasonable and proper, having regard for the traffic, the use of the road, and the condition of the road, to wit, at a rate of speed of 50 miles an hour; that, in meeting the Overland automobile, the driver failed to seasonably turn his truck to the right of the center of the highway, but remained in the center of the road, and that such carelessness and negligence was the proximate cause of the injury.

As a result of the collision, the said Ardyce I. Schwarting sustained a basal fracture of her skull, one of her kidneys was torn loose, her hearing and eyesight were impaired, her ability to walk, read or study was also impaired, she was confined in a hospital for many days, and it was maintained that she would be permanently mentally and physically impaired, and compelled to spend large sums òf money for care and attention. The suit was for $75,000, and the verdict of the jury was for $15,000.

A special appearance, supported by two affidavits, was filed, setting out that the appellant owns and operates, under the name of the Union Transfer Company, certain trucks used for the transportation of freight and express, and that he is the sole owner of the business, and that he never had an office of any kind in Lancaster county, but admits that his trucks deliver freight therein, and that the pretended service of summons was upon John B. Johnson, one of his truck drivers, by a deputy sheriff of Lancaster county, in Lincoln, Nebraska, on January 9, 1931, and that said driver was not a managing agent for the appellant, or employed otherwise than as a driver of a truck, and charges that the provisions of section 20-406, Comp. St. 1929, do not authorize such service and are unconstitutional and void.

The counsel, in the argument of this case before this court, devoted the greater part of their time to this question of venue, which had been raised by means of this special appearance, and which exception had been preserved at every stage of the trial. The section of our statute under which service of summons was made, being section 20-406, Comp. St. 1929, reads as follows: "An action against a railroad company, or an owner of a line of mail stages or other coaches, *a bus or trucking company*, for an injury to person or property upon the road or line, or upon a liability as a carrier, may be brought in any county through or into which the road or line passes: *Provided that service of summons upon bus companies or trucking companies may be made as upon other persons, or by leaving a copy of the summons by the proper officer with any ticket agent, chauffeur or driver of said bus company or trucking company, or left at the usual place of doing business of said company within said county.*"

This act was originally passed in 1866, and applied to railroad companies and the owners of mail stages or coaches, for an injury to person or property upon that line, and suit might be brought in any county through which the line passed. The legislature of 1929 amended the section by adding the words set out in italics, thus making it apply to bus or trucking companies and providing that service of summons might be made on such companies by leaving a copy of the summons with any chauffeur or driver of said bus or trucking company, as was done in this case, and it is claimed that this is a special law against such trucking companies, and violates section 18, art. III of the Constitution of Nebraska; that it deprives the owner of said trucking company of his property without due process of law, thereby violating section 1 of the Fourteenth Amendment of the United States Constitution; that it is unreasonable and discriminatory against such trucking companies, and cites in support thereof *Galloway v. Wolfe*, 117 Neb. 824; *Althaus v. State*, 94 Neb. 780; *In re De Klotz*, 98 Neb. 861; *Frost Trucking Co. v. Railroad Commission*, 271 U. S. 583; *Louisville Gas*

*& Electric Co. v. Coleman,* 277 U. S. 32. To meet this argument, the appellee first insists that the court should not inquire into the constitutionality of an act unless upon proper request by one who has demonstrated by evidence that the evil effects claimed have, in the very suit on trial, operated upon him to his detriment, citing 1 Cooley, Constitutional Limitations (8th ed.) p. 338. The appellee pointed out in his argument that the appellant was asked upon cross-examination, "You carry liability insurance that protects you personally against damages by reason of this truck that was involved in the accident, do you not?" A. "Yes, sir;" and that, therefore, as he is protected by liability insurance, he has no personal financial interest in the outcome of this litigation, and therefore his constitutional rights are not invaded, as he does not stand to lose a dollar by the determination of this case, and that the insurance company, upon which the burden of payment of any judgment rests, has not made itself a party to the action, nor even disclosed its name, and having remained anonymous in this litigation, appellee insists that the court will not pass upon a constitutional question upon the request of one who will suffer no injury from the enforcement of the provisions in question.

Admitting there is some point to this argument, the court calls attention to the fact that it is a well-known fact that liability insurance is written in all sums, and the policy in question might be anything from $1,000 to $50,000, or more, and no proof is before us that Ogram may not have to pay a portion of the judgment secured in this case.

The test is whether Ogram actually is injured by some oppressive rule or requirement, and in a recent decision, *Bain Peanut Co. v. Pinson,* 282 U. S. 499, Justice Holmes said: "In deciding whether a corporation is denied the equal protection of the laws when its creator establishes a more extensive venue for actions against it than is fixed for private citizens, we have to consider * * * whether the difference does injustice to the class generally, even though it bear hard in some particular case, which is not

alleged or proved here. *Louisville & Nashville R. Co. v. Barber Asphalt Paving Co.,* 197 U. S. 434; *Patsone v. Pennsylvania,* 232 U. S. 138, 144. This it is for the corporation to make out. The range of the state's discretion is large. *Armour & Co. v. North Dakota,* 240 U. S. 510, 516, 517. The question seems to be answered by *Cincinnati Street Ry. Co. v. Snell,* 193 U. S. 30, 36, 37, which lays down that, if the protection of fundamental rights by equal laws equally administered is enjoyed, the Constitution does not forbid allowing one person to seek a forum from which another in the same class is excluded."

It is insisted that the provisions mentioned, of both the state and federal Constitutions, are violated because the classification is unreasonable and without substantial basis with reference to the evil sought to be remedied. Judge Sanborn set out the three indispensable conditions necessary to insure a reasonable classification in *Chicago, M. & St. P. R. Co. v. Westby,* 178 Fed. 619, 47 L. R. A. n.s. 97. These conditions may be set out in brief as follows: (1) There must be a difference between the situation and circumstances of all the members of the class and of others which presents a natural reason or necessity for the difference made by law in their liaibilities and rights; (2) no person who does not belong to the class may be included therein, and all persons therein must be treated alike; (3) all who are in the same situation and circumstances of the members of the class must be brought under the influence of the legislation and treated the same as members of the class.

An act, providing for service in an action against an automobile owner in a county other than that where the injury sued for occurred, was held not invalid as a local or special law, in violation of section 7, art. III of the Constitution of Pennsylvania. *Garrett v. Turner,* 235 Pa. St. 383.

■ Appellant contends that the amendment of 1929 is unreasonable and, by violating the conditions set out by Judge Sanborn, is unconstitutional, in that it singles out common carrier trucking and bus lines and makes them

liable to respond for injuries to person and property in any county in this state in which process can be served upon a driver engaged in the trucking business. While, upon the other hand, hundreds of business firms, such as wholesalers, milling and public utility companies, are operating trucks, indistinguishable from those owned by common carrier trucking lines, over the same highways, and while they are just as liable to cause injuries to person or property, yet they cannot be brought into court for such injuries under this section of our statutes.

We can admit that, if the legislature had provided that any kind of suit, such as one founded upon a note or contract, could be brought against common carrier truck lines in any county where a driver could be served, it would violate the rules announced by Judge Sanborn. Did the legislature do that? No; it clearly limited the actions which could be so instituted to actions for injury to person or property. Why did the legislature do this? Doubtless because such common carrier bus and trucking companies make as continuous use of our state highways for their own private profit as if they had built them, in fact, use them very much as the railroads do their own tracks, so the legislature, after careful deliberation, enacted this amendment, rightfully placing common carrier bus and trucking companies in a separate class from motor vehicles engaged in hauling the property of the owners thereof.

The members of the legislature having determined that a particular law was necessary for the public good, and this question being one particularly within their power and jurisdiction, their action should not be interfered with by the courts unless their power has been improperly or oppressively exercised. 8 Neb. Law Bulletin, 174; *Wenham v. State,* 65 Neb. 394, 58 L. R. A. 825.

Is not the real question whether appellant, Ogram, suffered by reason of being compelled to defend this suit in Lancaster county, because of the service of summons upon his driver in this county, rather than being allowed to defend this suit in the county of his residence, at Fremont?

This court knows that in both of these forums he would be given equal protection of the laws of the state of Nebraska, and that such laws are administered in the same manner in the district courts of both counties, and under the recent amendment of our legislature to section 20-406, Comp. St. 1929, it is the right of a person, alleging injury by reason of the negligent operation of a truck, to determine in which county said suit will be brought if summons is served upon a driver of defendant engaged in the trucking business in such county, and this provision operates impartially upon every owner of a bus or trucking company in this state. This court finds that it was within the power of the legislature to enact said provision, and if any injustice appears therein, it must be corrected by the lawmaking power, and not by the courts.

It is set out as another ground for reversal that said section 20-406 provides that such service of summons can be made upon the driver "of a bus or trucking *company*," and not, as was done in this case, upon the driver of a truck of an individual owner, as Henry Ogram, the appellant.

In support thereof, we are furnished with a large number of definitions of the word "company" from respectable authorities, defining it as an association of persons for a joint purpose, especially for carrying on a business.

It is undisputed that Henry Ogram is the owner and operator of a trucking business, with its principal office at Fremont, where he has resided for more than 25 years; that he operates more than 30 trucks; that some of these are operated along regular lines, to wit, Omaha to Sioux City, Sioux City to Fremont, Fremont to Norfolk, Fremont to Columbus, Fremont to Lincoln, Fremont to Omaha, and Omaha to Des Moines, upon which routes the trucks operate each way every day. It is further shown by the record in this case that this very extensive trucking business, upon seven regular lines daily, and upon additional special order destinations, all engaged as common carriers of freight and express, and owned personally by

Henry Ogram, have been and are now operated under the trade-name of the Union Transfer *Company.*

We hold that the legislature intended to apply these provisions of law to all common carrier lines engaged in the transportation business by trucks or busses; that it was not concerned with what particular legal agency owned the motor vehicles, but intended to include corporations, firms or individuals, for the first sentence of the said section 20-406, omitting the words which have no application to this case, would read: An action against the *owner* of a bus or trucking company for an injury to person or property upon the road or line may be brought in any county through or into which the road or line passes. It is clear that the legislature intended to have this section apply to every "owner," whether such owner was an individual or a company. *Singer Mfg. Co. v. Wright,* 97 Ga. 114, 35 L. R. A. 497; *Efland v. Southern R. Co.,* 146 N. Car. 135; *Atlantic Coast Line R. Co. v. State,* 135 Ga. 545.

Appellant holds forth to all with whom he does business that they are the property of the Union Transfer *Company,* and to dismiss this judgment secured against him on this technicality would violate every principle of justice and right.

■ Complaint is made that the witness Charles Klone was permitted to testify, over appellant's objections, that he passed the same truck some 600 feet before it collided with the Overland car in this case, and that the truck was then running at a speed of 35 to 40 miles an hour. The bill of exceptions discloses that the trial judge rightly excluded other evidence offered as to the speed of this truck at more distant points, and the question is presented to us whether the admission of this evidence is reversible error. In the days of the horse and buggy, it may be admitted evidence from such a distance would be too remote. But a truck traveling at the speed shown would be at the place of the collision in possibly a half dozen *seconds,* and many courts have held that this would not be too remote. It was held that when a car was being driven at an extra-

ordinary rate of speed a few *minutes* before a collision, such evidence should have been submitted to the jury. *Wilson v. Fleming*, 89 W. Va. 553. That when the machine was going at an excessive rate of speed a mile from the place where the collision occurred, and the speed did not slacken until after the collision, this evidence should be admitted. *Taxicab Co. v. Hamburger*, 146 Md. 122. Testimony properly admitted of speed four blocks from the place of accident. *Wigginton's Admr. v. Rickert*, 186 Ky. 650.

This question of the admissibility of the speed of a vehicle shortly prior to the time of the accident rests largely in the discretion of the court. In the case at bar, no abuse of that discretion is shown. *Traynor v. McGilvray*, 54 Cal. App. 31; 1 Wigmore, Evidence, pp. 514, 574.

It is charged, as a ground for reversal, that the court erred in giving instruction No. 9 upon its own motion. This, in the main, was the instruction usually given upon the measure of damages in case the jury found for the plaintiff, but objection is made to this portion thereof: "In fixing the amount of damages for such personal injuries, you will consider the character and extent of the injuries, whether same are temporary or permanent, that is, their *probable* duration with reasonable certainty, the pain and suffering, if any, occasioned by said injuries." It is insisted that the use of the word "probable" destroys the effect of the instruction and leaves the jury in the realm of speculation, and that in the case of *Burkamp v. Roberts Sanitary Dairy*, 117 Neb. 60, a judgment was reversed because the trial court gave an instruction telling the jury that it might consider the pain and suffering which plaintiff "will *probably* suffer in the future," as the language was too indefinite and conjectural, but added: "The only future pain and suffering which the jury is entitled to consider is such as the evidence shows with reasonable certainty he will experience." In *Chicago, R. I. & P. R. Co. v. McDowell*, 66 Neb. 170, Commissioner Ames reversed the case, and said: "The mere fact that the injuries are permanent does not remove the

element of uncertainty as to the amount of damages which they may cause, nor relieve the court from the duty to instruct the jury that only such as are reasonably certain to result therefrom can be compensated by their verdict." The true rule would be that, to entitle a plaintiff to recover present damages for apprehended future consequences, there must be such a degree of probability of their occurring as amounts to a reasonable certainty that they will result from the original injury. In the case of *Nixon v. Omaha & C. B. Street R. Co.*, 79 Neb. 550, it was held, in reversing the case, to be the duty of the court, in instructing the jury as to any future damages, to charge that only such as reasonably stand to result therefrom can be compensated by their verdict; and in *Bower v. Chicago & N. W. R. Co.*, 96 Neb. 419, it is held that the jury could allow damages for such prospective suffering and loss of health, if any, as the jury may believe, from all of the evidence before them, he will sustain by reason of such injuries. *Chicago & N. W. R. Co. v. De Clow*, 124 Fed. 142.

In this ninth instruction, the objection to the words "probable duration" would have much weight if these words had not been followed by the words "with reasonable certainty," which rightly kept before the jury that recovery for such permanent injuries must not be speculative, but must be such as, based upon the evidence introduced, are reasonably certain in the course of human events to result from the original injury. The giving of this instruction was not reversible error.

■ We will next take up the question of the compensation awarded by the jury in this case. In this connection it might be well to call attention to the result of a study for two and a half years of compensation for automobile accidents, made by a committee of the American Bar Association, which sets out the law in many states, and is found in vol. 18, No. 4, p. 221, of the Journal of the American Bar Association for April, 1932.

Five doctors were called as witnesses, and gave detailed evidence in regard to the injuries suffered in this case,

which evidence was supplemented by ten X-ray pictures and 23 pages of graphic charts, prepared daily by the nurses, and it is insisted that the verdict of the jury for $15,000 is excessive, because appellant insists that the skull was not fractured, although Dr. Bell, who took the X-ray pictures of the skull immediately after the accident, testified that there was such a fracture, and pointed out to the jury the exact location of such fracture on the pictures. The injured girl had never had any trouble with her eyes or vision prior to the accident, but has had continual trouble since. She was asleep in the rear seat when the crash occurred, and immediately became as stiff as a board, so that her limbs could not be flexed after the accident. She vomited blood at the hospital, where she remained many days. After returning to her home, she suffered many dizzy spells, her appetite is poor, she has pains in her left ear, has not been able to do any household work or farm work since the accident, she has lost her healthy complexion, has a yellowish cast to her features, and seems somewhat lifeless. One of the doctors testified that her kidney was misplaced and was one-third larger. At the time of the injury she was a student in the third year in high school, with her grades averaging between 90 and 95; the principal testifying that she was then above the average student. Since then she has been compelled by physical disabilities to be absent from school about one-fourth of the time, is very forgetful, and unable to carry her work in school as she did before. She is nervous and cries easily, has severe headaches, and it was testified that, as a result of these conditions, traumatic epilepsy will develop, all as a result of this accident, and that this condition is permanent and cannot be cured; that the trouble with her ear is due to a change in the brain tissues that has come from a contraction of the scar formed at the basal skull fracture. One physician testified that she is progressing towards traumatic insanity.

The appellant insists that the verdict is grossly excessive and entirely disproportionate to the damage done to the plaintiff, and in any event should be reduced, and the

evidence of the doctors testifying for the appellant made light of the symptoms and the seriousness of the results of the accident. The jury, during the days of the trial, doubtless studied the condition of this young lady, who was in court but did not testify, and listened to all of the testimony relating to her injuries.

In *City of South Omaha v. Sutliffe*, 72 Neb. 746, a verdict returned for $10,000 for injuries to a 3½-year-old child, which caused downward pressure of the parietal bones upon the brain, was reduced to $7,000 by this court, while in *Hoskovec v. Omaha Street R. Co.*, 85 Neb. 295, a verdict of $12,750 was held to be no more than compensatory, where a 22-year-old woman was injured so that her mental and physical faculties were impaired and she was unable to engage in her usual avocations.

The jury, after listening to all of the evidence produced during the days of the trial, found that the driver of the truck was negligent, and fixed the amount of the recovery at $15,000, and this court will not substitute its judgment on a question of fact left for the jury to determine; and, finding no reversible error in the record, the judgment is

AFFIRMED.