GERTRUDE DOUGLAS, Plaintiff-Respondent, v. LEONARD TWENTER and B. J. WESSING, Defendants-Appellants, No. 43074—259 S. W. (2d) 353.

Division One, June 8, 1953.

Motion for Rehearing or to Transfer to Banc Overruled and Opinion Modified on Court's Own Motion, July 13, 1953.

*Henry W. Buck, W. H. Curtis, Howard F. Major* and *Roy D. Williams* for appellants; *Morrison, Hecker, Buck, Cozad & Rogers* of counsel.

74

*Herbert C. Hoffman* and *William H. Becker* for respondent; *Clark & Becker* of counsel.

COIL, C.—At the outset we rule two motions which were taken with the case.

Respondent's motion to dismiss the appeal on the ground that appellants' brief violates S.C. Rule 1.08 in that it allegedly does not contain a fair and concise statement of the facts without argument, is overruled.

Appellants' motion to strike and expunge from our records respondent's "Narrative Digest of the Testimony" is sustained. In this connection, we call attention to S.C. Rule 1.08 (c) which provides in part: "The respondent in his brief may adopt the statement of facts of the appellant, or, if not satisfied therewith, he shall in a concise statement correct any errors therein." Subsection (d) of the same rule provides that respondent's brief shall not exceed 90 pages with-

out leave of court being first obtained. Respondent's "Narrative Digest" consists of 153 printed pages. This, in addition to a brief of 67 pages. If the separate "Narrative Digest" volume be considered part of respondent's brief, the total pages (220) exceed the number allowed by the rule. However, the "Narrative Digest" may not be considered part of respondent's brief because no attempt is made therein to correct any errors in appellants' statement by a concise statement by respondent. In short, there is no provision or authority for filing such a document as respondent's "Narrative Digest of the Testimony"; and such should not be filed, unless under unusual circumstances justifying an order of court permitting it. We are certain that respondent was attempting to aid the court by furnishing this "digest" but, for many reasons, the statutes and rules pertaining to the documents authorized on appeal should be enforced.

On March 12, 1950, plaintiff-respondent was a passenger in an automobile being driven by her husband westwardly on U. S. Highway 40. About 6:15 p.m., about eight miles west of Columbia, she was injured in a collision between the automobile and a stock truck being driven eastwardly by defendant-appellant Twenter for his employer, defendant-appellant Wessing. The jury returned a verdict for plaintiff for $60,000 and defendants appealed from the ensuing judgment.

Defendants contend that the trial court erred: in the admission of evidence, in giving instructions, and in permitting allegedly improper argument. They also contend that the judgment is excessive and so excessive as to show bias and prejudice on the part of the jury.

Plaintiff submitted her case on excessive speed and failure to drive as close to the right-hand side of the highway as practicable. The highway was straight and ran upgrade from the east to the crest of a hill, west of the collision point. The pavement for appreciable distances east and west was covered with a "glaze" of ice.

Plaintiff's evidence showed that the truck approached the collision point on the wrong or left side of the pavement and struck the automobile when it was either fully or partially off the pavement (to the north) and when it had stopped or practically stopped. The truck stopped on the north shoulder, on its right side, facing north. The automobile came to rest near the center of the pavement facing east.

Plaintiff, her husband, and another passenger in the automobile testified that the truck was traveling at 40-45 m.p.h. as it came over the hill and at the time of the collision. A state highway patrolman testified that Twenter, shortly after the collision, said that his truck was going 40-45 m.p.h. immediately before and at the time of collision. Twenter did not categorically deny having made this statement; he said he did not remember making it. He did, however, testify that he was driving on his right side of the road at about 25 m.p.h.

Plaintiff's counsel, in his opening statement, proposed to prove that about three miles west of the collision point Twenter passed east-

bound automobiles which were ■■■■ traveling on the slick road at 25 or 30 m.p.h. Defendants' objection that such evidence would be "too remote from the scene of the accident to constitute any admissible evidence as to the conduct of this automobile" was overruled. Plaintiff's counsel then stated that he would also show that close to the point of, and shortly before, the collision, Twenter, while traveling 40 to 45 m.p.h., passed another string of cars. No objection was made to that statement.

Twenter, called by plaintiff, denied that he had passed any eastbound automobiles on the day in question. Thereafter, when plaintiff's counsel was about to examine Charles Turner, the trial court indicated, out of the hearing of the jury, that the testimony concerning Twenter's having passed cars three miles from the collision point would be admitted on the statement of plaintiff's counsel "that you are going to follow it up". Plaintiff's counsel said that other witnesses would testify that the truck passed their automobiles between that place (three miles away) and the collision point. "I'm going to bring it up continuously to the scene of the accident, * * *."

Charles Turner and a passenger in his automobile testified that the same truck later involved in the instant accident passed their automobile three miles from the collision point and continued on to pass another automobile or two ahead of them. Five other witnesses testified that, at a place $\frac{1}{2}$ to $\frac{3}{4}$ miles west of the collision point, Twenter, at a speed of 40 to 45 m.p.h., passed the two automobiles which the witnesses were either driving or in which they were riding; and some observed Twenter pass other cars ahead of them, which were also traveling eastwardly at 20 to 25 m.p.h. "in a procession".

Viewing the testimony of these five witnesses from the standpoint most favorable to plaintiff, and according to plaintiff all reasonable inferences therefrom, the jury could have found that Twenter continued to drive at 40 to 45 m.p.h. from the time he was last observed by these witnesses until he reached the crest of the hill just west of the collision point. True, none of the five testified that he observed the truck until it *reached* the crest of the hill; but the testimony of some of them was such that the jury could find that the witnesses' observation continued until the truck was near the crest and that this observation was only a few seconds before the collision.

. One of the ultimate facts to be proved by plaintiff was the truck's speed at the time of the collision. We are of the opinion that the testimony of these five witnesses was legally relevant, i.e., material on the ultimate issue of speed at the time of the collision. This because: This testimony tended to corroborate the accuracy of the testimony of the witnesses who testified as to the speed at the time of the collision, and tended to make it more probable that the statement as to speed attributed to Twenter by the patrolman was an accurate statement. Thus, this testimony might well have aided reasonable jurors in

determining whether the truck's speed at the time of the collision was 40-45 m.p.h. Whether the probative value of this testimony on the ultimate issue of excessive speed at the time of the collision was sufficient to justify its admission, in view of the positive testimony on this issue, was a question for the trial court in the exercise of a sound discretion. We may not say that this testimony introduced "many new controversial points and a confusion of issues" or constituted unfair surprise or "undue prejudice disproportionate to the usefulness of the evidence." Jones v. Terminal R.R. Ass'n of St. Louis, Mo. Sup., 242 S. W. 2d 473, 477. We hold that the trial court did not abuse its discretion in admitting this testimony. See: Olson v. Rose, Wash. Sup., 151 P. 2d 454, 456[1, 2]; Dean v. Bolduc, Sup. Judicial Ct. of Mass., 4 N.E. 2d 441, 442[1, 2]; Mathews v. Dudley, Cal. Sup., 297 P. 544, 545[1]; Schwarting v. Ogram, Nebr. Sup., 242 N.W. 273, 81 A.L.R. 769, 775; 61 C.J.S., Motor Vehicles, § 516r, pp. 268, 269; Wigmore on Evidence, 3rd Ed., Vol. 2, § 382, n.10, p. 324.

Defendants rely upon Sisk v. Industrial Track Const. Co., 316 Mo. 1143, 1150, 295 S.W. 751, 753, and Long v. Mild, 347 Mo. 1002, 1011[7], 149 S.W. 2d 853, 858[13, 14]. The Sisk case involved a collision between a truck pulling a trailer and a horse-drawn wagon on the levee in St. Louis. Of the refusal of the proffered testimony of a witness as to the speed of the truck and trailer before the collision, the court said: "He only saw the vehicles when a block away from the scene of the accident, and 'never noticed them any more.' His having seen them a block away from the scene, and not thereafter, afforded no basis for even a conjecture as to the rate of their speed after he lost sight of them. The immateriality, therefore, of this testimony is so apparent as to require no further discussion." 295 S.W. 753[5].

An estimate of the speed of a truck traveling along the levee in a city, even though only a block from the scene of collision, is not comparable to the instant situation involving an estimate of the speed of a truck on U. S. Highway 40 at the crest of a hill several hundred feet west of the collision point.

In the Long case a witness testified that an automobile continuously traveled at 50-60 m.p.h. between a point several miles from the collision and up to within 3½ blocks of the collision. We said: "* * * defendants' evidence sufficiently connected up this speed testimony by evidence tending to show that such speed was continuous all of the way from the Country Club to the place of collision." 149 S. W. 2d 859. True, there had been continuous observation of the speed of the vehicle to the collision point. But the absence of continuous visual observation for a certain distance does not necessarily make prior speed testimony inadmissible. Our instant ruling is in harmony with the principle of the Long case.

 We consider now the testimony of the two witnesses who testified that defendants' truck, going 40-45 m.p.h., passed their automobile

three miles from the collision point. This testimony was admitted upon plaintiff's counsel's assurance that the truck's speed would be shown continuously to the scene of the accident. Counsel failed to produce the evidence indicated. There was no testimony as to the speed or operation of the truck from the 3-mile point to a point about ½ or ¾ miles from the collision point. Thus the evidence of speed of the truck three miles from the scene of the accident was, under the circumstances, proof of a prior negligent act, wholly unconnected with the alleged negligent speed at the time of collision. This testimony, unconnected as it was, was too remote to tend to prove excessive speed at the collision point. It seems apparent that this testimony should not have been admitted, or, after admission, should have been stricken and withdrawn from the jury's consideration.

However, we have carefully considered the question of whether this testimony was sufficiently prejudicial in this case as to materially affect the merits of the action or to deprive defendants of a fair trial. RSMo 1949, § 512.160 (2), V.A.M.S. We have decided that the record discloses circumstances from which the conclusion should follow that this improperly admitted evidence was not "so prejudicially unfair as to compel a new trial." Winkler v. Macon Gas Co., 361 Mo. 1017, 1028, 238 S.W. 2d 386, 393.

We have held the testimony of the five witnesses as to prior speed material and admissible; the testimony of the two other witnesses as to the same prior speed was the same type of testimony as that which the jury properly considered. There was abundant substantial testimony of the speed of the truck at the time of the collision; it is not likely that the testimony as to speed three miles away had any material effect upon the jury's determination that Twenter's speed at the time of collision was excessive. The rate of speed to which the two witnesses testified, 40-45 m.p.h., was not so great as to make the mere statement of it inflammatory. Plaintiff submitted excessive speed and failure to drive to the right in the conjunctive. There was substantial evidence to support both submissions. Thus, the jury found both excessive speed and failure to drive to the right. Consequently, inadmissible evidence of prior speed, even if considered by the jury on the issue of speed at the time of the collision, presumably did not affect the jury's finding on the other issue, sufficient alone to sustain the verdict. Finally, the trial court must have considered the effect of this testimony at the time defendants' motion for new trial was ▮▮▮ overruled. In gauging the prejudicial effect of this evidence the trial court was in a uniquely advantageous position to determine whether this testimony had materially affected the merits of the action. The trial court reached the conclusion that it had not.

We hold that, for the reasons stated, the admission of this evidence did not constitute reversible error.

■ Defendants contend that plaintiff's instruction 1 was argumentative and gave undue prominence to immaterial evidence. The instruction is long (slightly more than three transcript pages) and permitted unnecessary and unessential findings based upon the hypothesis of evidentiary facts. We said in Knight v. Richey, Mo. Sup., 250 S.W. 2d 972, of our prior opinion in Yates v. Manchester, 358 Mo. 894, 217 S.W. 2d 541, that: "The Yates case and cases following the Yates case are not to be read or construed as requiring the submission of facts which are not necessary or esential to a finding upon the issue or issues of negligence specifically submitted." 250 S.W. 2d 978. The Knight case did not hold that it is error for plaintiff to assume the burden of hypothesizing and requiring findings of unnecessary and unessential facts. And an instruction which does so is not necessarily prejudicially argumentative or erroneous because it thereby gives some prominence to unnecessary evidentiary facts. But it is true that an instruction which fails to hypothesize a factual situation in a plain and simple manner and gives *undue* prominence to certain evidence may well be erroneous because argumentative.

Instant instruction 1 in effect submitted that the operation of the truck in excess of 30 m.p.h. under the circumstances shown in evidence was negligence. It was proper, therefore, for plaintiff to hypothesize the circumstances under which a jury could reasonably find that the truck's operation in excess of 30 m.p.h. was negligence. We are of the opinion that the circumstances hypothesized were material considerations for the jury in determining whether a speed in excess of 30 m.p.h. was negligence.

Furthermore, defendants attack only that part of the instruction which deals with excessive speed. It is conceded (at least no criticism is made of the submission) that a proper submission was made of Twenter's failure to drive as close to the right-hand side of the road as practicable, a submission, as noted, made conjunctively with excessive speed. Thus, even if there were some justification for defendants' insistence that the issue of excessive speed "occupies the center of the stage throughout the long instruction.", the fact remains that before the jury could return a verdict for plaintiff it must have found that Twenter negligently failed to drive as close to the right-hand side of the road as practicable and that his failure to do so was a proximate cause of plaintiff's injuries. And the entire instruction is clear and explicit. While, in one sense, it consists of a single sentence, that sentence is separated into distinct parts by proper punctuation; so that, whatever infirmity may exist in the portion submitting excessive speed, a jury would encounter no difficulty in determining what it needed to find to return a verdict for plaintiff on either issue. That is to say, the length of this instruction and its form and content do not tend to make it confusing or misleading. And there was substantial evidence to support each hypothesis. Under these circumstances, and

particularly in view of the conjunctive submission of speed and failure to keep to the right, even if parts of the instruction dealing with excessive speed were unnecessary and may have been somewhat argumentative, we think the instruction was not reversibly erroneous.

Defendants also say the instruction is so drawn that the jury might conclude that Twenter's negligence, which it was required to find as a proximate cause of the collision, included his speed at places remote from the collision point. However, the instruction (after requiring a finding of negligent speed and a finding of failure to drive as near the right-hand side of the highway as practicable) required the jury to find "as a direct and proximate result of the carelessness and negligence of the truck driver Twenter aforesaid, (if you so find) that the truck came into violent collision with the Chevrolet automobile in which the plaintiff was riding and that said collision occurred on the north side of the center line of U. S. Highway No. 40 * * * and if you further find that the plaintiff was injured in said collision," etc. We are unable to agree that the "carelessness and negligence aforesaid" would be construed by the jury to include a finding of negligent speed prior to and unconnected with the negligent speed at the time of the collision.

Defendants also contend that no facts are hypothesized to show how the excessive speed caused or contributed to cause the collision. However, there was evidence from which the jury could find that a speed in excess of 30 m.p.h. was negligence under the circumstances and the jury was required to find that such negligence directly contributed to cause the collision.

Plaintiff's instruction 3 was: "The Court instructs the jury that, if you find that any witness in this case has wilfully sworn falsely to any material fact, then you are at liberty to disregard all or any part of the testimony of such witness." Defendants contend that the instruction is erroneous because it "gave the jury a single incomplete standard for judging the credibility of witnesses." In Wilcox v. Coons, 362 Mo. 381, 241 S.W. 2d 907, an instruction substantially like instruction 3 had been refused. This court, en banc, in holding the refusal not error, said: "Defendants say this was the 'usual instruction' in relation to false swearing, but this is quite inaccurate. The proffered instruction will be at once recognized as merely a single sentence which has been lifted bodily from the conventional form of instruction on credibility of witnesses. A sufficient answer to defendants' complaint of 'grievous' error and abuse of discretion' is that the credibility of witnesses is not to be determined by the application of a single standard—that of knowingly and willfully swearing falsely. We have been cited to no case where the giving of only a fragmentary portion of a credibility-of-witnesses instruction has ever been asked, much less held to be reversible error to refuse it." 241 S.W. 2d 914.

The Wilcox case does not rule the question here. It does not follow that, because the refusal of the instruction was approved in the Wilcox case and because no case was there or is here cited in which the giving of such an instruction has been approved, giving it was reversible error. The decisive consideration is whether the instruction, even though only a part of the usual credibility instruction, misdirects the jury or is prejudicial.

True, the instruction is fragmentary in the sense that it contains only one of the matters to be considered in determining the credibility of witnesses. But the matter it purports to cover is stated accurately enough. (While the language that the jury is "at liberty to disregard" was criticized in State v. Willard, 346 Mo. 773, 783, 142 S.W. 2d 1046, 1052, the instruction was not there (nor has it since been) held to be reversibly erroneous for using that language. Instant defendants used a similar expression in their instruction D-B on the subject of the "testimony contrary to physical facts or common experience.") The effect of the instruction is not to tell the jury that the credibility of witnesses "is to be determined by the application of a single standard." If defendants desired to offer an instruction submitting some other matter to be considered in determining credibility, or a complete instruction encompassing all the matters for consideration in determining credibility of witnesses, it was their privilege to do so. While the refusal by a trial court to give the instruction is not error (Wilcox v. Coons, supra), and while we do not commend the use of this fragmentary instruction, we see no basis on this record for holding it reversible error in this case.

█ Defendants contend that plaintiff's instruction 4 (measure of damages) is "misleading, confusing, and ambiguous, and * * * constituted a positive misdirection to the jury." The instruction directed the jury, in determining the amount of plaintiff's damages, to consider the nature and extent of her injuries, physical pain and mental anguish suffered and reasonably certain to be suffered as a direct result of the injuries, and "Sixth, all impairment, if any, of her capacity to work and labor which you believe from the evidence to be the direct result of her injuries so received, *not including, however, (any earnings or) the value of any services which she might have rendered since her injury or might in the future render, the value of which (and the earnings of which), under the law, her husband is entitled to.*" (Italics and parentheses ours.)

We agree that the italicized portion is not as clear as it should be. And probably, as defendants contend, the italicized language was unnecessary. However, we do not agree that the language is reasonably subject to a construction which made it a positive misdirection, or made it prejudicially misleading.

Defendants do not contend that impairment of capacity to work and labor is not a separate item of damage in a personal injury action by

a housewife. The first part of "Sixth" clearly submits that item. The italicized portion is lacking in clarity only because of the inclusion of the words appearing in parentheses, viz., ("any earnings or") and ("and the earnings of which"). If these two phrases are eliminated, the entire paragraph is clear and, if anything, states the matter more favorably to defendants than necessary. It would appear that the noted references to earnings are left dangling. Apparently, words are omitted which should have been included to make the meaning of the entire paragraph undoubtedly clear. We think, however, a jury would understand from the language used that it was not to award plaintiff any damages for loss of earnings or value of services past or future because these were items of damages recoverable by her husband.

Defendants say that the jury might have construed the language as indicating that it was to "separate the earnings and services belonging to the husband from those belonging to the wife," without any indication as to which services and earnings the wife is entitled. As defendants point out, there was no pleading that, or evidence of, any earnings of plaintiff, or the value of any of her services. We think the jury would not understand the instruction as a direction to award damages to the wife for any loss of earnings or for any value of loss of services, past or future. Furthermore, we are convinced that any ambiguity or lack of clarity in the italicized portion of the instruction did not prejudice defendants. This, because even though the jury may have been confused as to what earnings, past or future, were referred to, it, nevertheless, would understand that plaintiff was to be awarded no damages on account of them.

Defendants contend that plaintiff's counsel made an improper and highly prejudicial argument wherein he told the jury "that defendants were covered by insurance." The only portion of the argument of either of plaintiff's counsel to which defendants point and to which any objection was made, was this portion of Mr. Hoffman's argument:

"* * * I want to say one more thing. Gentlemen, don't you worry about the amount or the size of your verdict. That is a job for we lawyers. Mr. Becker and I will take care of that. If there is any question about collecting the judgment that is our problem— MR. MAJOR (one of defendants' attorneys): If the Court please, we object. I think that is improper. MR. BECKER (one of plaintiff's attorneys): It is not improper. THE COURT: Objection will be overruled.

"MR. HOFFMAN: I know Mr. Becker will close this argument but I cannot close this now without saying to you that I take from my shoulders and I turn over to yours the responsibility for Mrs. Douglas. I am asking you to go out and bring in a verdict for Gertrude Douglas. I'm asking you to bring her life, to bring her happiness.

"MR. MAJOR: If the Court please, we ask that these gentlemen be instructed to disregard the argument that Mr. Hoffman made in reference to this verdict. THE COURT: The motion will be over-ruled."

Immediately preceding that portion of the argument, Mr. Hoffman, without objection, had been painting the "miserable and dark" future in store for plaintiff and contending that the only "ray of light at the end of the tunnel" was the verdict to be rendered by the jury. He urged, without objection, that no. compromise be effected; that if nine jurors could agree upon an "adequate sum of money to care for her the rest of her life, to give her the medical attention she will need, to compensate her for the permanency of these injuries, nine or more of you bring in your verdict." Considered in this setting, and in view of the fact that the sentence objected to was not completed, we think this statement standing alone, would not be understood as meaning that a judgment would be collected from an insurance company.

Defendants say, however, that other color and meaning is given to the statement by other portions of the record, including the voir dire examination and other argument. They point out that on voir dire (without objection), the usual inquiry was made as to any connection with a named insurance company. The other parts of the argument (to which no objections were made) are these:

(1) "* * * We bear no malice against Mr. Twenter. He was doing a job that day. We bear no malice against Mr. Wessing. He appears to be a fine, upstanding gentleman and I am sure that there are not any two men in this court room who regret more what happened out on that highway. * * *"

(2) "* * * Gentlemen, I have said and I say again, repeating, we bear no malice, we bear no ill will against Mr. Wessing and Mr. Twenter. We do not desire to hurt Mr. Twenter. * * *"

(3) "* * * I haven't any feeling against Mr. Wessing and he hasn't against me nor Mrs. Douglas and all you men know, I believe, I hope you do, that I wouldn't do any legal wrong to any man and I wouldn't come in here and ask you for a good, substantial verdict in keeping with this case if I had any intention of any nature whatsoever to do any legal wrong to Twenter or Wessing. * * *"

(4) "* * * The Supreme Court will uphold any verdict, in my opinion, that you bring in in this case and let Mr. Hoffman and I worry about it. We've worried about plenty of them before. Remember, there will be no legal wrong done, as a result of your verdict, to any man. * * *"

And defendants point to this incident during the argument of their counsel:

(5) DEFENDANTS' COUNSEL: "I say to you when you go to the jury room, I want you to remember that you are twelve fine,

honorable jurors of Boone County, entrusted not only with the rights of Mrs. Douglas in this $100,000 lawsuit, but with the rights of Barney Wessing and his five kids and with the rights of Leonard Twenter and his four kids—

"MR. BECKER: Now, I object, Your Honor, to his reference to any families of the defendants. I intend to do no legal wrong to any of them and they know it and that is an improper argument and an appeal for sympathy and I object to it." The objection was sustained.

These isolated parts must be examined in their relation to the whole argument. Thus, immediately preceding that part numbered (1) above clearly indicates that the reference to lack of malice on the part of plaintiff and her counsel toward Twenter was in connection with plaintiff's contention that Twenter had told an impossible story that was such that defendants' counsel would not even attempt to explain Twenter's testimony. The argument numbered (2) above was made in connection with the assertion that plaintiff had not insisted on the prosecution of Twenter or upon the surrender of his chauffeur's license. Immediately after the statement "We do not desire to hurt Mr. Twenter" appears: "We know that he holds a chauffeur's license. We didn't insist that he be prosecuted that day. I was consulted on the matter and I told them, 'No, there is no point in trying to send him to jail.'" When arguments (1) and (2) are considered in their contexts, any reference to lack of malice and ill will and to no "desire to hurt Mr. Twenter" cannot reasonably be construed to refer to insurance coverage.

Argument (3) above was also made in connection with plaintiff's failure to insist upon the prosecution of Twenter. Counsel had stated that it was simply a question of time until someone would be injured by Twenter's conduct. Immediately after stating that he did not intend any legal wrong, counsel said, "Most people would have been ▮▮▮▮ so mad and infuriated that they would have had this boy jerked up before Judge Morgett, like many, many, many of them have done, if they had any malice in their hearts. This is a simple business proposition." And argument (4) above was made in connection with an appeal for a compensatory verdict, regardless of size. The statement as to the verdict not resulting in a legal wrong done could well be understood to refer to the absence of an attempt by plaintiff to interfere with Twenter's opportunity to continue as a chauffeur. At least, we may not say that this argument in its context gives any particular meaning to the single argument to which objection was made. And as to incident (5), we think plaintiff's counsel's objection was retaliatory to the argument made by defendants' counsel.

But, in determining the cumulative effect of these statements, we consider that the trial court had before it all of the arguments of counsel when it overruled the assignment in the motion for new trial as to the prejudicial effect of the argument. Defendants rely upon Phil-

lips v. Vrooman, Mo. Sup., 251 S.W. 2d 626, and Buehler v. Festus Mercantile Co., 343 Mo. 139, 119 S.W. 2d 961. In the Phillips case, the trial court *granted* a new trial on the ground that the argument, considered in the light of the whole record, told the jury that an' insurance company would pay. We said: "In ruling the propriety of argument, a trial judge may determine how the jury might reasonably construe the language used. Often the language itself is so clear that there can be no doubt as to its meaning. However, in many instances, the language may reasonably be said to convey more than one meaning. In such event, the trial judge's determination of the propriety of the argument need not necessarily be based solely on the language itself. The argument may be interpreted by the trial court in its 'setting' and against its 'background'—in short, in the light of the other circumstances of the particular case." 251 S.W. 2d 630[2, 3]:

In the Buehler case we held the language (counsel said plaintiff was entitled to $50,000 and "don't worry about who we will collect it from") unmistakably implied that a judgment for $50,000 would be collected from an insurance company. In the instant case the sentence ("If there is any question about collecting the judgment that is our problem—") was not completed. We have pointed out that the statement (and we cannot know what the rest of it would have been) must be considered in its context. Counsel's plea for a compensatory verdict, irrespective of size, did not constitute an unmistakable reference to insurance.

We agree with the trial court, who, after considering the single argument to which there was an objection, in the light of the entire record, was of the opinion that the jury would not reasonably construe the single argument as a reference to insurance or to mean that an insurance company would pay the judgment. We hold that the trial court did not err in overruling the objection made.

In determining the question of excessiveness of verdict, we consider the evidence as to the nature and extent of the injuries from a standpoint favorable to plaintiff. Meade v. Kansas City Public Service Co., Mo. Sup., 250 S.W. 2d 513, 517[5].

Plaintiff was 46 years old with a life expectancy of about 23 years. She sustained a laceration of the neck 2½" to 3" deep, extending from just below the right jawbone adjacent to the right ear, around her throat, to beyond the midline and almost to the left corner of her lower jaw. She was taken to a hospital in an unconscious state, in shock, and suffering from loss of blood. The external jugular vein, the mandibular artery, and the numerous small blood vessels had been severed. A two-hour operation followed the administration of plasma and whole blood. She remained unconscious or in a semiconscious state and in shock for two or three days. She left the hospital March 31, 1950. A later operation was performed in the Mayo Clinic in September, 1951.

The injuries to the neck, throat, face, and mouth may be generally described as the severance of, or damage to, the nerves and muscles which govern or control facial expression, eating, tasting, swallowing, feeling with the tongue, and retention of saliva. The nerves involved are the fifth, seventh, and twelfth cranial; the lingual (branch of fifth cranial), which supplies sensation and taste, and the facial nerve (branch of seventh cranial), which supplies the platysmal muscle, were severed; the hypoglossal (branch of twelfth cranial), which supplies the muscles of the tongue, was damaged. The muscles which control swallowing, the digastric and the geniohyoid, were severed or damaged. The platysmal muscle, the muscle of expression, was severed on the right side. This muscle controls the right side of the lower lip. The muscle by which the tongue is brought forward, the glossohyoideus, was damaged or severed, and other muscles which also have to do with the normal working of the tongue and mouth, including the hypoglossus and mylohyoideus muscles, were severed or damaged. The submaxillary gland was lacerated, necessitating the removal of its distal portion.

As a result of these permanent injuries, Mrs. Douglas has and will always have: great difficulty in controlling food with her tongue (that is, getting it back to the throat), and difficulty in swallowing; lack of sensation or taste on the right side of the tongue, atrophy of the right side of the tongue, protrusion of the tongue to the right, inability to raise tongue to the roof of the mouth, or to bring it forward much beyond her front teeth; difficulty in speaking evidenced by inability to enunciate clearly; great difficulty in drinking; the possibility of strangulation due to aspiration of food into the windpipe; inability to show teeth, an asymmetry of face by the drooping of the right corner of the mouth and the right side of the lower lip; a blank, unmoving expression on right lower side of her face; a constant accumulation of saliva which drools from the right corner of the mouth; weakness in the back part of the pharynx; and some damage to the roof of the mouth.

From the time of the accident to the time of trial, there had been some improvement in the functions controlled by the permanently injured nerves and muscles. The improvement had reached the maximum expected and plaintiff's disabilities were reasonably certain to continue in their then-existing state throughout her life. No operation or other corrective procedure could improve her condition beyond that existing at the time of trial. The Mayo Clinic operation, an attempt to restore the function of some of the damaged nerves and muscles, was said by plaintiff's medical witnesses to have been unsuccessful. Plaintiff also has a hairline scar at the site of the laceration. No plastic surgery can minimize the cosmetic appearance, viz., the asymmetry of the face, drooping of the right corner of the mouth and right lower lip, or the unmoving and fixed expression on the right side of the face.

Plaintiff also sustained an aggravation of a preexisting arthritic condition. She had had no arthritic trouble in the spine prior to the accident; since the injury she has been continuously suffering with pain in the lower back and in the right sacroiliac region. Her medical testimony indicated that whether this was a permanent condition was entirely speculative but that the pain would continue for an indefinite period.

At the time of trial plaintiff was about 30 pounds under normal weight. There was a recurrence of an anemic condition for which she previously had been treated but from which she apparently had recovered prior to the accident.

Since her discharge from the hospital and in addition to the time spent at the Mayo Clinic, plaintiff has been under the care of physicians who have attempted to alleviate her back pain, eliminate her anemia, and improve her methods of eating and swallowing.

There has been a marked psychological effect evidenced by periods of depression due to her inability to perform normally the functions of eating, drinking, swallowing, and from the drooling of saliva. She has and will suffer great mental anguish and humiliation as a result of her injuries.

Prior to the accident plaintiff was a normally healthy woman with regular and reasonably handsome features. She had a pleasant disposition and was well poised. She was active in church work, a teacher in the Sunday School and week-day church school, and took a leading part in the social ▪▪▪ life and other activities of the church. She often spoke before groups of people. She was active in the Parent-Teachers Association, in the Eastern Star, and in an organization of wives whose husbands were distributors of the Kansas City Star. She could eat and drink normally. She spent some of her time in reading to her grandchildren. She helped her husband in his business by taking telephone calls and assisting in the deliveries of the papers.

Since the accident, she has taken no active part in church affairs or other activities requiring public appearances. Witnesses testified that it is difficult to understand her; that she ordinarily refuses to eat or drink in public; that her facial appearance is distorted as compared to her appearance before the accident; and that she seems to suffer much embarrassment by reason of the drooling of saliva. She experiences a feeling of shame when she eats in public because to get food to the back of her mouth, where it can be swallowed with difficulty, is embarrassingly noisy. The saliva flow continues at a decreased rate during the night.

We have examined the record and find nothing therein which would indicate that the $60,000 verdict was the result of bias and prejudice on the part of the jury. The size of the verdict alone does not indicate bias and prejudice. McCaffery v. St. Louis Public Service Co., 363 Mo. 545, 52 S.W. 2d 361, 368[7-9].

It is apparent that "no normal person would voluntarily be afflicted with such injuries as plaintiff has received for any amount of money; but that cannot be the measure of damages in a court of law. * * * If it were, then in many cases all of a defendant's assets would have to be transferred to a plaintiff so seriously and permanently injured; but that would not be a just or workable rule in negligence cases." Counts v. Thompson, 359 Mo. 485, 504, 222 S.W. 2d 487, 496.

No case has been cited by either party wherein the injuries are fairly comparable with those in the instant case. However, it appears that Easterly v. American Institute of Steel Construction, 349 Mo. 604, 610, 162 S.W. 2d 825, 828, 829 (not cited), furnishes some general basis for reasonable comparison.

In that case a 51-year-old housewife sustained fractures of the nose, left jaw, two ribs, and of both bones in the right leg below the knee. The nose injury resulted in a permanently warped septum which interfered with breathing and caused excessive secretions of one side of the nose. There was a deep cut in the nose and lip, resulting in disfiguring scars and numbness of the lip. These facial conditions, except the numbness, were correctible by surgery. The jaw fracture had healed but due to numbness of the lip and part of her face she "could not tell when food would run over her lip." The ribs had healed but there remained some discomfort. The fractures of the tibia involved a shattering of the bone from midway between the knee and ankle almost to the ankle joint. There was a diagonal break with some shattering of the fibula. A fair result was obtained but the broken leg was an inch shorter and an inch larger than the other, which in time would probably cause a tilting of the pelvis. The movement of the ankle joint was limited and circulation in the leg was poor. Mrs. Easterly also sustained a collapsed lung, was nervous, had been using crutches for 13 months prior to trial, and was unable to perform her duties as a housewife. Her mental and nervous processes and reactions were somewhat slowed.

In the Easterly case a verdict for $35,000 was reduced by the trial court to $25,000. We permitted a judgment for $23,400 (the $25,000 less interest discounted—the judgment postdated the verdict by about 14 months) to stand.

Mrs. Easterly was 51; Mrs. Douglas was 46. There were no losses of earnings or medical and hospital expenses in either case; both plaintiffs were housewives. Mrs. Easterly had a flow of mucous from her nostril, correctible by surgery; Mrs. Douglas drools saliva, a condition not correctible. Mrs. Easterly's disfigurement was surgically correctible; Mrs. Douglas' change in appearance is not correctible. Mrs. Easterly had a loss of feeling in her lip; Mrs. Douglas sustained permanent loss of taste and feeling on the right side of the tongue. Mrs. Easterly sustained serious fractures of the leg. In the instant case there were no such fractures. On the other hand, the injuries

sustained by instant plaintiff to the nerves and muscles of the neck, throat, and mouth were far more severe and disabling than any similar injuries sustained by plaintiff in Easterly.

Mrs. Easterly could not perform her duties as housewife (whether this was a permanent condition is not indicated, the inference being that it was not); Mrs. Douglas apparently could perform her duties as housewife. The Easterly case was decided in 1942.

As we have indicated heretofore, we do not mean that the two cases are comparable in any other than a general way. We are convinced that taken by and large, instant plaintiff's injuries are more severe than those in Easterly. In cold print plaintiff's injuries are reduced to words which fail to convey the full impact of the result of these particular injuries upon plaintiff. The change in her appearance, her sense of humiliation, her understandable refusal to attempt her former happy and normal social life, and the ever-present drooling from the corner of her drooping mouth, undoubtedly have made her an entirely different person.

Taking into consideration: present economic conditions; that the trial judge, who had an opportunity to observe the appearance, actions, bearing, and the general effect of the injuries upon plaintiff's appearance, did not think the verdict excessive; and that there is no exact formula for determining the excessiveness of a verdict; we are of the opinion that the maximum amount plaintiff should recover is $37,500. If plaintiff will within 15 days enter here a remittitur in the sum of $22,500, the judgment will be affirmed for $37,500 as of the date of the judgment below. Otherwise, the judgment will be reversed and the case remanded for a new trial. *Van Osdol* and *Lozier, CC.,* concur.

PER CURIAM:—The opinion by Coil, C., herein is adopted as the opinion of the court except that the order of remittitur is modified to require a remittitur of only $12,500. Therefore, if plaintiff will within 15 days enter a remittitur in the sum of $12,500, the judgment will be affirmed for $47,500 as of the date of the judgment below; otherwise the judgment will be reversed and the cause remanded for a new trial. All concur.