The STATE OF TEXAS and the Board of Regents of the University of Texas, Trustees of the Hogg Foundation, W. C. Hogg Memorial Fund, Plaintiffs,

v.

The UNITED STATES of America, Defendant.

Civ. A. No. 1526.

United States District Court
W. D. Texas,
Austin Division.

Jan. 18, 1967.

Waggoner Carr, Atty. Gen. of Texas, Austin, Tex., B. L. Bird, Fort Worth, Tex., Burnell Waldrep, Austin, Tex., for plaintiffs.

Mitchell Rogovin, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., Robert L. Waters, Atty., Tax Div., Dept. of Justice, Fort Worth, Tex., for defendant.

## MEMORANDUM OPINION

ROBERTS, District Judge.

This is a suit for refund of income taxes paid, brought by The State of Texas and the Board of Regents of the University of Texas on behalf of the Hogg Foundation—W. C. Hogg Memorial Fund.

### I.

In the 1920's, Will (W. C.) Hogg, Mike Hogg, Tom Hogg and Ima Hogg, owners

1

of various downtown and urban Houston and San Antonio properties, placed ten fee properties and two long-term leaseholds in a Texas corporation called the Varner Company, each receiving one-fourth (¼) of the stock.

Will Hogg, a bachelor, died in 1930, leaving the residue of his estate, including one-fourth of the stock of the Varner Company, to certain individual beneficiaries and his Executor (Mike Hogg), providing that the residue was to go in either of three ways, as his Executor, with the advice of Miss Ima Hogg, should determine, one of which was to give it to the Regents of the University of Texas to establish a foundation for lectures on the history, literature, art and social and political experiences of mankind. The Executor, with the advice of Miss Ima Hogg, elected this latter alternative, and by deed dated July 1, 1939, the Executor of the Will Hogg Estate conveyed various lands, oil properties, securities and other properties to the Board of Regents of the University of Texas, with full right of management, use and disposal, but for the benevolent, educational and public purposes stated in the Will Hogg will. None of the stock of the Varner Company was included in this transfer to the University of Texas, Will Hogg's one-fourth (¼) of such stock having been partitioned to Mike, Tom and Ima Hogg, leaving these three owning all of the stock of the Varner Company in equal undivided one-third (⅓) interests.

The Board of Regents of the University of Texas set up thereafter the "Hogg Foundation—W. C. Hogg Memorial Fund" and set up accounts on the books of the University in that name.

Mike Hogg, the owner of one-third of the stock of the Varner Company and certain notes executed by the Varner Company payable to him died in the early 1940's, and by his will left the residue of his estate, including such Varner stock and notes, to his wife, Alice Nicholson Hogg, for life, and at her death to the Regents of the University of Texas as remaindermen. Mrs. Hogg later became Alice N. Hanszen.

Tom Hogg died in 1949, and by his will left a life estate in his residual estate, including his one-third of the Varner Company stock and certain notes executed by the Varner Company payable to him, to his wife, Margaret W. Hogg (subject to certain obligations to Mrs. Marie W. Hogg and Mrs. Lillie Burkett), with the remainder to the Hogg Foundation.

As of the first part of 1952, Miss Ima Hogg owned outright, one-third of the stock of the Varner Company and certain of its notes; Alice N. Hanszen had a life estate in one-third of such stock and certain notes, with the Board of Regents of the University of Texas as remaindermen; and Margaret W. Hogg had a life estate in one-third of such stock and certain Varner notes, with the Board of Regents of the University of Texas as remaindermen.

In 1952, pursuant to discussions between the Board of Regents of the University of Texas and the members of the Hogg family, in an attempt to partition their joint holdings or otherwise terminate the undivided holdings in the Varner stock, appraisals of the properties and leaseholds were made by a Mr. Richards of the Second National Bank of Houston, and a Mr. Woodal of the Houston Bank and Trust Company. The discussions culminated in certain offers, by letter of May 25, 1952, as follows:

A. Miss Ima Hogg proposed to sell two thousand (2,000) shares, which was one-third (⅓) of the stock of the Varner Company, and, various promissory notes aggregating $371,229.00 in principal amount, to the "W. C. Hogg Memorial Fund" for $2,000,000.00, payable

(1) $50,000.00 in cash at closing; and

(2) Semi-annual installments of $50,-000.00 for twenty (20) years, none of which installments in-

cluded interest, and none of which could be prepaid; and

(3) The conveyance to her of the Anderson-Clayton Building (valued in the Richards' appraisal at $234,000.00), one of the Hogg Houston buildings owned by the Varner Company.

B. Mrs. Alice N. Hanszen proposed to sell her life estate in 2,000 shares of the Varner Company and notes aggregating $241,163.21, plus individually-owned notes amounting to $130,065.79, to the "W. C. Hogg Memorial Fund", payable

(1) $1,390,000.00 in cash at closing; or

(2) $1,900,000.00, payable $47,500.00 at closing, and a like amount every six months thereafter for twenty (20) years. It was provided that any of these amounts could be prepaid without penalty, and at a figure involving a discount at the rate of three and one-half per cent (3½%) annually on all anticipated installments.

C. Mrs. Margaret W. Hogg proposed to sell her life estate in 2,000 shares of the Varner Company, and its notes totalling $339,601.00 (subject to obligations to Mrs. Marie W. Hogg and Mrs. Lillie Burkett), and a $5,000.00 Varner note, to the "W. C. Hogg Memorial Fund", as follows:

(1) The W. C. Hogg Memorial Fund was to assume payment of the obligations due to Mrs. Marie W. Hogg, and Mrs. Hogg was to assume payment of the obligations due Mrs. Lillie Burkett; and

(2) The sum of $1,174,000.00 in cash at closing for the residue; or

(3) $1,600,000.00, payable $40,000.00 at closing and a like amount semiannually for twenty (20) years. Pre-payment of any or all install-

ments was permitted at a figure discounted at the rate of three and one-half per cent (3½%) annually on all anticipated payments.

These offers stated that they were based on the higher of the appraisals of each Varner Company property and leasehold made by Mr. Richards and Mr. Woodal. It was also stipulated that if the installment payment plan was elected, liens to secure the installments would be reserved on the Varner Company stock and notes, but that the Hogg ladies would consent to the dissolution and liquidation of the Varner Company, in which event the liens would automatically be transferred to the properties distributed to the Hogg Foundation—W. C. Hogg Memorial in the dissolution of the Varner Company.

The Board of Regents of the University of Texas accepted these offers, electing to purchase by the installment method. By instruments of conveyance dated June 30, 1952, the proposal and the acceptance were carried out. On July 30, 1952, the Varner Company was dissolved and its assets conveyed to the Hogg Foundation. The assets consisted of improved downtown store and office buildings, some of which were subject to unexpired leases of more than five years' duration and unimproved, unleased properties. The total purchase price paid and payable by the foundation was allocated to the various items of real property and leaseholds on the basis of the Woodal and Richards appraisals which, in turn, had constituted the basis of the proposal to sell of Miss Hogg, Mrs. Hogg and Mrs. Hanszen. All of the properties acquired upon the liquidation of the Varner Company, when not vacant, were rented to third parties.

The parties agree that the total initial cost (or basis) of the stock and notes of the Varner Company to the Hogg Foundation was $6,232,327.99, and the total indebtedness incurred to acquire

the Varner properties and leaseholds was $5,581,190.80, and that such basis and indebtedness was properly allocated as follows:

| Particular Property | Allocation of Acquisition Basis | Allocation of Indebtedness to Acquire Particular Properties |
|---|---|---|
| Varner Building | $ 664,238.17 | $ 594,840.32 |
| Gunter Building | 704,220.58 | 630,645.47 |
| Bettes Building (Mitchell) | 1,350,551.92 | 1,209,449.82 |
| Negley Building | 551,347.25 | 493,743.94 |
| Finnigan Property | 1,330,447.38 | 1,191,445.75 |
| River Oaks Property | 368,090.44 | 329,633.32 |
| Magnolia Property | 87,908.08 | 78,723.68 |
| Sternenberg Leasehold | 169,361.02 | 151,666.63 |
| Brunner Lots | 3,942.07 | 3,530.21 |
| Sens Leasehold | 1,971.03 | 1,765.10 |
| Rossonian Property | 886,964.92 | 794,297.16 |
| Central Company Property | 113,285.13 | 101,449.40 |
| | $6,232,327.99 | $5,581,190.80. |

Beginning in 1953, various Varner properties and leaseholds were sold, and the proceeds thereof and other funds of the Hogg Foundation were applied to the annual payments of Miss Ima Hogg's debt and the full payment of the debts due Mrs. Hanszen, Mrs. Margaret W. Hogg and Mrs. Marie W. Hogg, until on July 31, 1959, the Hogg Foundation owned only the Finnigan, Mitchell and Rossonian properties, and the only debt incurred to acquire the Varner properties was $1,250,000.00 due Miss Ima Hogg in semi-annual installments of $50,000.00. Under the contract of June 30, 1952, the debt to Miss Ima Hogg could not be prepaid. When the debts and obligations of Mrs. Hanszen, Mrs. Margaret W. Hogg and Mrs. Marie W. Hogg were paid in full, they released the Hogg Foundation from such debts and they released and quitclaimed all liens on the Varner Properties. By instrument of July 9, 1954, Miss Ima Hogg released and discharged the pertinent Varner properties from her liens and debts. In the year ending July 31, 1962, the Rossonian property was sold, leaving only the Mitchell and Finnigan properties held by the Board of Regents of the University of Texas.

Section 511, Internal Revenue Code of 1954, levies a tax on the "unrelated business income" of various organizations previously exempt from income taxation. It excludes from the taxable portion of such income all dividends, interest, annuities, royalties and rents except rents from "a business lease" as defined in Section 514.

Section 514, Internal Revenue Code of 1954, provides that in determining the unrelated business taxable income for any tax year—

"(1) Percentage of rents taken into account.—There shall be included with respect to each business lease, as an item of gross income derived from an unrelated trade or business, an amount which is the same percentage (but not in excess of 100 per cent) of the total rents derived during the taxable year under such lease as (A) the business lease indebtedness, at the close of the taxable year, with respect to the premises covered by such lease is of (B) the adjusted basis, at the close of the taxable year, of such premises.

(2) Percentage of deductions taken into account.—There shall be allowed

with respect to each business lease, as a deduction to be taken into account in computing unrelated business taxable income, an amount determined by applying the percentage derived under paragraph (1) to the sum determined under paragraph (3). * * *"

Section 514, Internal Revenue Code of 1954, does not speak of buildings, or properties, but of leases, and of course leases may cover less than a whole building or property.

Section 514(b) (1) defines a business lease as,

"For purposes of this section, the term 'business lease' means a lease for a term of more than 5 years of real property by an organization * * * if at the close of the lessor's taxable year there is a business lease indebtedness (as defined in subsection (c)) with respect to such property.".

Section 514(c) defines "business lease indebtedness" as meaning:

" * * * With respect to any real property leased for a term of more than 5 years, the unpaid amount of—

(A) the indebtedness incurred by the lessor in acquiring or improving such property.".

Thus the amount of rentals received from a five-year or longer lease which is to be included in unrelated business taxable income is to be determined by the following formula:

$$\frac{\text{Total remaining debt as of year end}}{\text{Adjusted basis of property at year end}} \quad X \quad \begin{array}{l}\text{Total applicable} \\ \text{rentals}\end{array}$$

Less:

$$\frac{\text{Total remaining debt as of year end}}{\text{Adjusted basis of property at year end}} \quad X \quad \text{Deductions} \quad =$$

Taxable Income.

———◆———

In its unrelated business income tax returns for 1953 and later years, the Hogg Foundation included in the numerator of the fraction mentioned in the foregoing paragraph, the unpaid indebtedness incurred to acquire the Varner Properties and leaseholds; as a property was sold, the portion of the total purchase price or basis allocated, as stated earlier, to the sold property, was dropped from the denominator of the above mentioned fraction, but the numerator was not correspondingly reduced. Thus, as properties were sold, the denominator of the fraction was constantly diminishing and would have become smaller than the numerator but for the fact that the Hogg Foundation reduced the business lease indebtedness by pre-paying the Hanszen and Margaret W. Hogg debts out of the sales proceeds and other funds. However, after December 24, 1954, when the Hanszen, Margaret W. Hogg and Marie W. Hogg debts had been paid in full, as other properties were sold, no prepayments on the Ima Hogg debt could be made, and, consequently, while the cost of the sold property was deleted from the adjusted basis of all properties (denominator), business lease indebtedness (numerator) was not reduced, and the percentage of rentals from remaining properties includible in unrelated business taxable income was increased. Thus, for 1960–1964, in determining the portion of the rentals arising from business leases on properties, the debt originally incurred to acquire other properties (which had been previously sold) was left in the numerator of the fraction, but deleted from the denominator. It is the contention of the plaintiffs in this case that the debts originally incurred to acquire the individual pieces of property should have been removed from the numerator as well as the de-

nominator of the pertinent fraction as the pieces were sold. Stated otherwise, they argue that the indebtedness attributable to a given piece of property cannot be shifted after that property is sold to the remaining portions of property for the purposes of computing the taxable portions of the rents being received from those remaining portions.

On the other hand, the Government contends that the total amount still owing on the original transaction, regardless of which properties it is attributable to under the original cost allocation, is the proper numerator of the fraction which determines the taxable portion of business lease rental income. In this regard, it is important that no part of the debt due Miss Ima Hogg could be prepaid by the Foundation. Thus, at any given point in time, the Foundation owed Miss Hogg portions of the debts incurred in acquiring all of the properties. Thus the Government argues all of these debts should be included in the numerator even though the pieces of property to which all but two of the debts relate have now been sold and no further rents are being collected from them.

In a sense, the question in the case is one of the proper focus of Section 511 et seq. of the Internal Revenue Code. If the focus is upon the transaction as a whole—the whole indebtedness incurred and the whole indebtedness remaining—then the position of the Government is correct. On the other hand, if the statute operates on each leased property individually, the indebtedness to be considered in computing taxable rentals would be only that indebtedness incurred in acquiring the properties still being held by the Board of Regents of the University of Texas, from which rentals were still being received. It is this latter view to which this Court is inclined.

■ The Government argues that the allocation of indebtedness agreed upon at the time of transfer of the properties to the Hogg Foundation is in the nature of a mere bookkeeping entry, and should

not blind us to the fact that the true amount still owing at the end of fiscal year 1964, was the $750,000.00 to Miss Ima Hogg. On the contrary, when a group of mixed assets is acquired for a lump sum, the sum must be allocated to each individual asset. This is a principle which permeates the entire Internal Revenue Code and Treasury Regulations thereunder. See, e. g., Regs. Sec. 1.61–6(a), and Regs. Sec. 1.167(a)–5.

■ The Government quite properly observes that the interpretation placed upon the statute by this Court would permit parties to a lease transaction to considerably alter their tax liability by agreeing to apply payments on the lease indebtedness otherwise than in proportion to the amounts originally owed on individual parcels of real estate. However, there is no evidence in this case that the agreement between Miss Ima Hogg and the Board of Regents of the University of Texas that none of the amount owing to her in installments could be prepaid was entered into with such alteration of liability in mind. For all that appears, the object of the agreement was to provide the stability and certainty of periodic installment payments over the twenty year period.

Accordingly, it is ordered that plaintiffs, The Board of Regents of The University of Texas, Trustees of the Hogg Foundation—W. C. Hogg Memorial Fund, do have and recover of and from the Defendant, the United States of America, sums of money as follows:

$12,350.17 with respect to the fiscal year ending July 31, 1960, with interest as provided by law on such sum from October 14, 1960;

$12,582.49 with respect to the fiscal year ending July 31, 1961, with interest on such sum as provided by law from October 9, 1961;

$9,461.53 with respect to the fiscal year ending July 31, 1962, with interest on such sum as provided by law from October 15, 1962;

$11,076.49 with respect to the fiscal year ending July 31, 1963, with interest

on such sum as provided by law from October 11, 1963; and

$7,189.52 with respect to the fiscal year ending July 31, 1964, with interest on such sum as provided by law from October 9, 1964.

It is further ordered by the Court that no execution issue to enforce this Judgment, but that the same be paid by the Treasurer of the Defendant.