**Dorothy KRUG, (Plaintiff) Respondent,**

**v.**

**STERLING DRUG, INC., (Defendant) Appellant,**

**and**

**Beaumont Pharmacy, Inc., (Cross-Claimant) Appellant.**

**No. 52098.**

Supreme Court of Missouri,
Division No. 2.

June 12, 1967.

Motion for Rehearing or to Transfer to Court en Banc Denied July 10, 1967.

Gray & Sommers, Charles E. Gray, C. Marshall Friedman, St. Louis, for plaintiff-respondent.

Chapman, Chapman & Litz, Wilton D. Chapman, Thomas W. Chapman, Arthur Litz, St. Louis, for appellant, Sterling Drug, Inc.

George E. Lee and Doris J. Banta, St. Louis, Carter, Bull, Baer, Presberg & Lee, St. Louis, of counsel, for appellant, Beaumont Pharmacy, Inc.

BARRETT, Commissioner.

In this action to recover $275,000.00 damages for serious injury to the plaintiff's vision, a jury returned a verdict in favor of the plaintiff, Dorothy Krug, and against Sterling Drug for $125,000.00 and Sterling has appealed. At the close of all the evidence the trial court directed a verdict in favor of the second defendant, Beaumont Pharmacy. Beaumont, however, filed a cross claim against Sterling for its attorneys' fees and expense of litigation; that claim was separately tried by the court, found in favor of Sterling and Beaumont has appealed from that judgment. Thus the appeals involve separate and distinct parties and issues, in one of which only Sterling and the plaintiff Krug are concerned and in the other only Beaumont and Sterling. And since, admittedly, there is no liability to Beaumont unless Sterling is held liable to Krug the appeals are of necessity disposed of in that order.

Unfortunately the parties, Sterling and Krug, in failing to precisely delineate and articulate respective basic theories, in briefing and urging numerous irrelevancies and factitious technicalities, have so thoroughly obfuscated essential and meritorious issues that the appellate function has been made unnecessarily difficult. See Judge Learned Hand, "The Preservation of Personality" in The Spirit of Liberty, Dilliard, p. 43. It is not necessary to detail the obfuscations, they are noted at the outset because they necessarily appear as this record of over a thousand pages and the appellant Sterling's eleven assignments of error are considered.

### STERLING DRUG APPEAL

By way of introduction it should be noted that Sterling Drug and Winthrop Laboratories are one and the same and that this action involves its trade-name drugs Aralen, Triquin and Plaquenil, all of which are compounded of its 1946 invented product chloroquine phosphate designed originally for the prevention and treatment

of malaria. In 1955 Sterling introduced the drug to druggists and the medical profession for the treatment of arthritis and discoid lupus erythematosus. Chloroquine, a prescription drug, among other side effects, has an affinity for the melanin pigment found in the eyes resulting in a condition now known as chloroquine retinopathy, a condition with which the plaintiff Dorothy Krug is afflicted. It may be well to also interpolate that Sterling and its drug, chloroquine, have been involved in four other reported cases, all concerned with impaired vision, in two of which Sterling was unsuccessful, Sterling Drug, Inc. v. Cornish (Eight Circuit), 370 F.2d 82 and Yarrow v. Sterling Drug, Inc. (U.S.D.C., S.D.), 263 F.Supp. 159, and in *two of which it was successful,* Cochran v. Brooke, (Or.), 409 P.2d 904, and Oppenheimer v. Sterling Drug, Inc., (Court of Appeals of Franklin County, Ohio), 7 Ohio App.2d 103, 219 N.E.2d 54. While the record in this case is quite unlike any of those cases in certain basic respects, a number of facts are common to all and need not be detailed here.

█ In passing, however, conspicuous differentiating factors in the two cases in which Sterling was successful should be noted. In the Oregon case the plaintiff sued her doctor for malpractice as well as Sterling and at the conclusion of the trial "all parties moved for a directed verdict." Under Oregon practice when all parties move for a directed verdict the judge determines the fact with the effect, as the Oregon court said, 409 P.2d 1. c. 905, 906, "The procedural posture of the case required the trial judge to decide the questions of fact. His decision '* * * must be sustained, if the record contains any substantial evidence to support the judgment * * *.'" At the same time the court observed that "Neither plaintiff nor defendants would have been entitled to a directed verdict had either party alone so requested the court to rule. The case was clearly one for the trier of the fact to determine." Under this procedure, at the

conclusion of a three weeks' trial, the trial judge found that there was no negligence on the part of either defendant and no breach of warranty by Sterling and that finding was supported—the only question before the Supreme Court of Oregon. This, of course, could not happen in this jurisdiction (Cluck v. Abe, 328 Mo. 81, 40 S.W.2d 558) and on appeal in a product's liability case, as in all other jury cases, in determining whether plaintiff made a case the evidence is viewed in the light most favorable to the plaintiff, disregarding the defendant's evidence except insofar as it may aid plaintiff's case. La Plant v. E. I. Du Pont De Nemours and Company, Mo. App., 346 S.W.2d 231, 234, a herbicide case. In the Ohio appeals case the trial court directed a verdict for the defendant and the appellate court agreed with that action, particularly did it agree that the record would not support a finding of proximate cause. But that factor alone, especially its proof, distinguishes Dorothy Krug's case, the Ohio court said, "In the record before us, *there is nothing to indicate that the doctor relied upon any information furnished by the defendant in prescribing Aralen for his patient * * *.* He said, further, he did not know it, Aralen, to be a prescription drug, and that in the use of it *he relied upon his own experience* and what he had learned at the meetings." 219 N.E. 2d p. 58.

█ The plaintiff's petition was in five counts but Sterling's liability and her right to recover was submitted upon the single assignment of *negligence* that Sterling knew or should have known of the "dangerous potentialities" of its drug and *"failed to give a timely and adequate warning to the doctor who was prescribing said drugs."* Upon this appeal Sterling does not challenge this basic rule and duty: "[W]here the drug is a prescription drug, the manufacturer has a duty to properly warn the doctor of the dangers involved." Yarrow v. Sterling Drug, Inc., 263 F.Supp. 1. c. 162; Sterling Drug, Inc. v. Cornish, 370 F.2d 1. c. 85; Annotations 79 A.L.R.2d 301, 324;

76 A.L.R.2d 9, 16. "(I)t is incumbent upon the manufacturer to bring the warning home to the doctor." Rheingold, "Products Liability—The Ethical Drug Manufacturer's Liability," 18 Rutgers L.R. 947, 993.

Recognizing this general rule and duty Sterling nevertheless contends that its motions for judgment should have been sustained for one or more of four reasons: (1) that Dorothy Krug's claim for injury to her eyes was barred by the five-year statute of limitations; (2) that as a matter of law the negligence of plaintiff's doctors was an intervening proximate cause; (3) that there was no duty to warn a small class (of which it is implied plaintiff was one) of peculiarly allergic or idiosyncratic users; and, (4) that there was no evidence that Sterling acted in any different manner than any other drug manufacturer in testing or warning and thus was not guilty of any negligence or of "failure to exercise due care." These assignments will be considered in the order in which they have been presented. The evidence and some facts are applicable to more than one of these overlapping issues, but once noted in one connection specific attention will not again be directed to them in considering another issue.

The plaintiff-respondent Dorothy Krug, 43, and her identical twin sister Doris have been afflicted with discoid lupus erythematosus since 1942 or 1943 and over the years have taken numerous prescribed drugs. These women are college graduates and have had a wide and varied experience in business; Doris, for eighteen years has been in the checking department of a bank, both have worked for doctors, including Dr. Weiss, and Dorothy for the past seventeen years has been a laboratory technician in the Washington University Dental School. Dorothy had been to other doctors but in 1945 became the patient of Dr. Weiss and he treated her and was her principal doctor until his death in 1963 and since then she has been treated by his office associate, Dr. Conrad. Thus the office records and correspondence of Dr. Weiss have been preserved and are a part of this record. In August 1953 Dr. Weiss for the first time prescribed Aralen, two 250 mg. tablets a day, and the drug improved Dorothy's lupus. Dr. Weiss continued to prescribe and Dorothy took Aralen until July 1957 when for the first time she noticed that her vision was sometimes "fuzzy." Dr. Weiss then prescribed Sterling's drug Plaquenil and from 1958 to 1962 Triquin, both chloroquine, but Dorothy's vision continued to worsen until 1961 when her eye condition stabilized and as Dr. Post says in 1965, she has no central vision and could count his fingers at two feet with her right eye and one foot with her left eye.

It is not necessary to refer in detail to Stering's chloroquine literature to the medical profession and to the retail druggists— some of it is noted in the four reported cases and all of it in large quantities is a part of this record. Its first pamphlet, April 1955, describing and recommending Aralen phosphate for the treatment of lupus, in its conclusion, warned only "Side effects such as nausea, headache, giddiness, abdominal cramps *and blurring of vision have been noted, but these disappear on reduction of dose or discontinuance of the drug.*" In some of its literature it was said that "Toxic effects are usually mild and to date have been transitory in nature, disappearing completely either on continuance (sic) or cessation of therapy or on reduction in dosage." After its original application to the Food and Drug Administration in 1946 and its supplemental application in 1957 that agency wrote to Sterling's Dr. Rice, May 22, 1959 and said that when "you submitted to us information in regard to the relationship of these drugs (Aralen and Plaquenil) to production of corneal changes it was understood, at that time, that you would supplement your applications to provide for revised labeling which would reflect this potential hazard." In June 1959 Sterling wrote to the department and noted certain studies that had been carried out but said that "we have serious doubts that the diminished visual acuity was related to ther-

apy." It proposed to enclose with its brochures as to reports of "visual halos or blurred vision" a statement that the condition was "reversible on cessation of therapy" in the opinion of investigators. In interoffice communications there were reports of "two instances in which retinal changes were noted in patients" and finally, February 8, 1960, Sterling's medical directors took note of the medical literature, beginning with the Hobbs 1959 report in the English journal "The Lancet," expressing the opinion that chloroquine caused macular lesions. Based on this "a tentative draft of a revision" of its literature for Aralen, Plaquenil and Triquin was proposed. But on March 25, 1960, there was a memorandum in Sterling's file "Do not advise F.D.A. now." And in May 1960 the appellant's director wrote the administration but it was not until February 1963 that Sterling sent doctors a letter of "Important Drug Precautions" noting that its drugs were helpful in the treatment of discoid lupus but that "certain ocular complications have sometimes been reported during prolonged daily administration of chloroquine." Therefore, it was recommended that patients be given "ophthalmologic examinations" and "Should corneal changes occur (which are thought to be reversible * *), the advantages of withdrawing the drug must be weighed in each case against the therapeutic benefits" and if "visual disturbances" occur it was recommended that the drug be "stopped immediately."

As indicated, the first report of a "possible association" of serious eye injury as a side effect of chloroquine came from three English doctors, known as the Hobbs report, in 1959. But the English journal received little attention. Between 1961 and 1963 special studies of chloroquine and serious eye damage were made at the National Institute of Health at Bethesda, Maryland, and these reports of the drug's affinity for melanin pigment and finally for the condition now known as chloroquine retinopathy were all reported in the medical journals. And in this case,

no doubt distinguishing this from all other reported cases, Dr. Weiss arranged for Dr. Bernstein, at National Health, who was conducting the studies for chloroquine damage, to examine the plaintiff Dorothy Krug and she was examined by him March 7, 1962 to April 25, 1962. It is not necessary to note his full reports and testimony, he found that Dorothy "had a retinal degeneration secondary to long-term chloroquine administration." He was of the opinion that her eye condition was permanent, irreversible and due to the drug chloroquine.

In the course of his treatment of Dorothy's lupus Dr. Weiss referred her to, among others, Dr. Sanders, an eye specialist. He examined her a number of times from 1947 to 1961 but, as he testified, "chloroquine retinopathy" was not known to anyone in the profession until 1959 and that is the reason he did not recognize the condition until he read about it in the American literature in 1961. And it was on that occasion in 1961 that Dorothy learned for the first time the cause of her eye condition.

In this background, as to the statute of limitations, Sterling argues that because Dorothy first noticed difficulty with her eyes in July 1955, "a blurring and blinding effect," which got worse until by 1957 there was "a diffuse degeneration of the retina" and that certainly "the latest that plaintiff could have filed her suit would have been in 1961, which would have been over five years after her first unusual eye symptoms appeared." Plaintiff's action was instituted on April 17, 1963, and her counsel point to the fact that she took chloroquine, in the form of either Aralen, Triquin or Plaquenil, on her doctor's prescriptions until 1961 or 1962, that her eye condition continued to deteriorate until 1961, and that, therefore, there was "a continuing tort" and the statute of limitations did not start until she stoppped taking the drug in 1961 and was made aware of her condition and its cause.

It is not necessary to distinguish the workmen's compensation cases, the instances of disease incident to and following immediate traumatic injuries (Annotation 11 A.L.R.2d 277, 280–281), the malpractice and numerous other causes from other jurisdictions. In the first place, while Dr. Weiss on occasion had misgivings he continued to prescribe chloroquine in one form or another and Dorothy continued to take it until 1961. And it was not until 1961 that Dorothy was informed by an eye specialist of the probable cause of her failing vision. But significant here as far as Sterling is concerned is the fact that medical journals, of which Sterling was bound to have knowledge (La Plant v. E. I. Du Pont De Nemours & Co., supra; Braun v. Roux Distributing Co., Mo., 312 S.W.2d 758, 763, a subsidiary point raised by the appellant) beginning in 1959 if not earlier (Yarrow v. Sterling Drug, Inc., supra) warned of the hazardous side effects of chloroquine and even then the appellant did not change its literature to timely and adequately warn the profession. Thus as the jury could find, until 1961 at least, there was continuing negligence, "a single wrong against which the limitation period commences to run only from the time of the cessation of the wrong." In this respect the case is distinguishable from the occupational disease cases, relied on by the appellant, in which the malady was not discovered until after the employees left their employment. Farrar v. St. Louis-San Francisco Ry. Co., 361 Mo. 408, 235 S.W.2d 391; La Porte v. United States Radium Corp., D.C., 13 F.Supp. 263.

But continuing negligence need not be the sole determinant, as others have pointed out (Radiation Injuries; Statute of Limitations Inadequacies In Tort Cases; 62 Mich.L.R. 753, 756) "(t)he Missouri legislature, however, has prescribed definite criteria for determining the date of accrual" of causes of action for an injury sustained in the circumstances of this particular record. Civil actions for torts must be commenced within five years "provided * * * the cause of action shall not be deemed to accrue when the wrong is done or the technical breach * * * or duty occurs, but when the damage resulting therefrom is sustained *and is capable of ascertainment*". RSMo 1959, § 516.100, V.A.M.S. Clohesy v. Century Electric Co., Mo.App., 142 S.W.2d 780, a case not cited by the parties, involved this provision of the statute. That was an action for damages from breathing and inhaling harmful dust while grinding castings from 1922 to 1926 causing pneumoconiosis, a chronic fibrous reaction in the lungs. It was there alleged "that plaintiff was thereby caused to suffer illness and disease which was not ascertainable by plaintiff until April, 1934." In considering whether the plaintiff's action was barred by the five years' statute of limitations as a matter of law the court posed the crucial question, "What does the record disclose as to when plaintiff's cause of action accrued?" It is too lengthy to set out here but the court reviewed the record fully, the medical as well as the plaintiff's evidence, as to the onset of his injuries and concluded: "We are constrained to the view that the trial court erred in granting defendant a new trial on the ground that the court should have sustained defendant's demurrer offered at the close of the case on the ground that plaintiff's cause of action was barred by the five years' statute of limitation. Upon the record before us reasonable minds might reach different conclusions as to whether or not plaintiff was suffering with pneumoconiosis, and if so when that fact was ascertainable. * * * Since, under § (516.100) plaintiff's cause of action, when considered in relation to our statute of limitations (quoting the provision above set forth), the record before us presents to our view, if believed, substantial testimony sufficient to make the question as to when plaintiff's cause of action accrued a question for the jury." In the Cornish case the appellant relied on the Kansas

two-year statute of limitations, in part the court said, 370 F.2d 1. c. 86, "There is no evidence that appellee suffered irreversible impairment of vision before June 1962, when she barely avoided an automobile accident after failing to see another car, nor that she could have maintained a cause of action for permanent eye injury prior thereto." In addition to the proviso of our statute, the rationale of the cases involving delayed manifestations or injuries caused by wrongful conduct which was unknown to the plaintiff at the time of the invasion of his rights is "that a person must have some notice of his cause of action, an awareness either that he has suffered an injury or that another person has committed a legal wrong which ultimately may result in harm to him, before the statute can begin to run." 62 Mich.L.R. 1. c. 764. This appeal is not concerned with how the issue should have been submitted (National Bank of Commerce in St. Louis v. Laughlin, 305 Mo. 8, 264 S.W. 706, 707, 717), and it is only necessary to say that for the reasons indicated it may not be said as a matter of law that plaintiff's cause of action was barred by the five-year statute of limitations.

■ The second reason assigned in support of its motions for judgment is that "the negligence of plaintiff's doctors was an intervening proximate cause of plaintiff's injury, and the trial court erred in so failing to rule as a matter of law." In this connection it is said that Dr. Weiss "experimented with chloroquine" in treating Dorothy's lupus and it is urged that there is no evidence that Dr. Weiss "relied on any recommendation from Sterling" when he prescribed for his patient. In support of this point the appellant relies for the most part on Oppenheimer v. Sterling Drug, the Ohio Court of Appeals case, in which, as previously noted, the plaintiff's doctor had not read and did not rely on Sterling's literature or insert directions. Also in that case the doctor did not know that Aralen was a prescription drug and did not treat it as such, there was only one prescription, May 23, 1958, and "(l)egally or illegally, the prescription was refilled approximately twenty times over a period of almost two and one-half years although the prescription carried a limit of six months and neither doctor nor druggist could recall or produce a record authorizing any renewal," and, apparently plaintiff had the prescriptions refilled on her own. There is no such record in this case and the warning in Sterling's early literature may have misled rather than warned a sizeable number of the medical profession of the hazardous side effects of chloroquine. Stromsodt v. Parke-Davis & Co., D.C., 257 F.Supp. 991, 997. But in this case there is an additional circumstance that is certainly not present in any other litigation Sterling may have had or for that matter in any other reported case. In 1956 Dr. Weiss wrote Sterling a long letter and report in which he fully described Dorothy, her malady and his treatment, especially his prescribing Aralen. He reported, however, that "this patient is slowly losing her eyesight" and he wondered "if Aralen might in any way be responsible for this loss of vision." There were interoffice communications on the subject of Dr. Weiss' letter, a company representative from New York went to St. Louis and interviewed the doctor, and finally on July 27, 1956, the company wrote the doctor a letter. It is a long letter and the full text need not be quoted but in part Sterling's doctor said, "as regards the Aralen possibility, I think this is unlikely. Aralen does cause visual disturbances, but published reports 1, 2 seem to indicate that the basis for the trouble is the drug's interference with the muscles of accommodation. The patient usually complains of blurred vision. I am pleased to enclose annotated bibliographies on lupus erythematosus mentioning reactions discussed, a lupus erythematosus brochure and an Aralen brochure. In all instances in which we are aware, *all of the toxicological manifestations of Aralen are reversible on reduction in dosage or cessation.* As far as I am aware,

*permanent blindness has never been reported and permanent tissue damage, anywhere, is not a feature of Aralen therapy."* Dr. Weiss replied to this letter and gave further information, the appellant's doctor replied and reaffirmed his previous statements. It is not necessary to comment on this correspondence or on the company's subsequent literature, as stated, there was a duty on the company to warn the medical profession. In Sterling Drug, Inc. v. Cornish, Sterling claimed that appellee's doctors negligently failed to keep up with the literature and that the trial court erred in not instructing the jury on "intervening proximate cause." But there and applicable here, as in Yarrow v. Sterling Drug, supra, the court said, 370 F.2d 1. c. 85, "There is no question of intervening proximate cause in this case. The sole issue was whether appellant negligently failed to make reasonable efforts to warn appellee's doctors. If appellant did so fail, it is liable regardless of anything the doctors may or may not have done. If it did not so fail, then it is not liable for appellee's injury. The issue was to be resolved by the jury, and we see no error in the court's instruction."

██ The appellant's third claim of nonliability as a matter of law, and as another subsidiary point failure to give an instruction, is that it had no duty to warn "an unidentifiable small class of users of the possibility they might suffer a peculiar allergic or idiosyncratic reaction" to its drug. It is said that this is especially true of a condition that came into medical knowledge after plaintiff had used the drug for some time. In this latter connection as with its previous claim of intervening cause it should be again noted that after the medical and scientific literature appeared and after its correspondence with Dr. Weiss the appellant Sterling did not then change its literature or write Dr. Weiss, as he had requested, and inform him of this new knowledge. Also not helpful is the list of cases from other jurisdictions in which there were no systemic injuries and hives and related maladies from the use of permanent wave solutions and other products resulted to one whose "injury constituted an isolated instance of injury to an unusually susceptible individual." Merrill v. Beaute Vues Corporation, 10 Cir., 235 F.2d 893. As was pointed out· in that case and its circumstances in which neither party could have known of the danger beforehand "a warning would have been wholly ineffective." The substantial evidence is that there was no connection between the malady discoid lupus and injury of the type sustained by plaintiff to her eyes although some of appellant's witnesses made some effort at asserting the contrary. Furthermore, there was no substantial evidence that Dorothy's eye malady resulted from an idiosyncratic reaction, and even so, as this court said of Notox, another hair dye, once the fact is established that an apparently harmless product contains known hidden dangers there is a duty to warn the unwary user. Arnold v. May Department Stores Co., Mo., 337 Mo. 727, 85 S.W.2d 748. It is not necessary to examine a mass of evidence and indicate the lack of probative force upon the issue, the appellant points only to bits of testimony from two of plaintiff's witnesses estimating percentages of people succumbing to chloroquine retinopathy and suggests that the evidence establishes idiosyncratic reaction. In the Cornish case Sterling objected to a trial court's instruction that "appellant had a duty to warn the medical profession of the susceptibility of such a hypersensitive or idiosyncratic group." In that case, as here, the court concluded that "there was sufficient evidence for the jury to find that appellant did in fact know, and thus could have foreseen, that some persons would be injured by the drug's side effect. Moreover, in this case we are dealing with a prescription drug rather than a normal consumer item. In such a case the purchaser's doctor is a learned intermediary between the purchaser and the manufacturer. If the doctor is properly warned of the possibility of a side effect in some patients, and is advised of the symptoms normally accompanying the side effect, there

is an excellent chance that injury to the patient can be avoided." (370 F.2d l. c. 85). Thus, as indicated, the appellant was not for this reason entitled to be exonerated as a matter of law and there was no manifest error in refusing the instruction (Evinger v. Thompson, 364 Mo. 658, 265 S.W.2d 726, 733), certainly not upon the basis of the three federal cases cited of which Merrill v. Beaute Vues Corp., supra, is typical.

■■■ Relying on the Oppenheimer case and a statement in a diseased pork-trichinosis case from Michigan—"No one is held by the law to a higher degree of care than the average in the trade or business in which he is engaged" (Cheli v. Cudahy Bros. Co., 267 Mich. 690, 695, 255 N.W. 414, 415), Sterling argues that there was no evidence that it "acted in a different manner than any other drug manufacturer in testing or warning and thus was not guilty of any negligence in failure to exercise ordinary care." It would serve no useful purpose to review all the record that might bear on this subject, appellant refers only to the testimony of two of its witnesses, a research specialist and its medical director who testified that "electro-retinograms and oculargrams," instruments used by Dr. Bernstein and the National Health Institute in diagnosing chloroquine retinopathy, were research tools commonly used in medical schools and not widely used prior to 1960 or 1961, meaning, of course, by practicing doctors and drug manufacturers. It is not explained just how these two isolated pieces of evidence prove the assertion that the appellant acted as other drug manufacturers and therefore "was not guilty of any negligence in failure to *exercise ordinary care*." As indicated, there were other tests and the available medical literature as early as 1957 and certainly by 1960 was such that "Sterling knew or had reason to know that some persons would be injured by the drug's side effects." Yarrow v. Sterling Drug, Inc., 263 F.Supp. l.c. 162. If this is not sufficient to dispose of this particular claim, it would appear that the manufacturer and distributor of a prescription drug to be ad-

ministered to human beings, as with the manufacturer of a weed killer or a hair dye, should be "held to the skill of an expert in that particular business" and " 'to an expert's knowledge of the arts, materials and processes,' and is bound to keep reasonably abreast of scientific knowledge and discoveries concerning his field and, of course, is deemed to possess whatever knowledge is thereby imparted." Braun v. Roux Distributing Company, Mo., 312 S.W. 2d l.c. 763; La Plant v. E. I. Du Pont De Nemours and Company, 346 S.W.2d l.c. 240–241. And it follows as a matter of course that there was no error in the court's giving Instruction 4 defining "negligence" as "failure to use the skill of an expert in the defendant's business."

■■■ Before urging the preceding point but concerned in some measure with it and perhaps with other points as well the appellant contended that the court erred in "permitting evidence of scientific knowledge learned after plaintiff was taken off the drugs." In its argument appellant points to the fact that Dr. Bernstein was permitted to testify to "scientific knowledge learned in 1962 and 1963, long after plaintiff was taken off chloroquine" and that its employees, charged with the duty of testing and manufacturing the drug, Dr. Foley and Dr. Dennis, were cross-examined "to amplify the same." Upon this trial some of the appellant's witnesses, doctors and researchers, took the position that there was no such thing as chloroquine retinopathy, others took the position that the drug's affinity for melanin pigment could not be produced or established in animals, of course, taking these positions, there would be no point in appellant's making tests as to any possible hazard as to eyes. But it is not necessary to say that this alone makes all the evidence admissible although it is all referred to in the other four reported cases. There was an objection when plaintiff's counsel asked Sterling's Dr. Foley whether he had read of Dr. Bernstein's experiments on animals showing a connection between eye injury and chloroquine. The objection

was that the tests were made long after Dorothy was off the drug and by means of instruments at the disposal of doctors but not available when she was taking chloroquine. In the first place Dr. Foley had an explanation for or minimized all prior or early reports of eye injury from chloroquine. As to the Hobbs report he said that they had all overlooked it. In numerous instances when 1960–1963 literature was referred to there were no objections, and prior to the noted question to Dr. Foley, as well as on redirect examination the appellant introduced or referred to numerous pieces of literature in 1962–1963. In these circumstances there was no manifest prejudicial error in the admission of the evidence specifically referred to in the appellant's assignment.

■ The appellant has one other assignment relating to instructions, it is urged here that Instruction 2 was erroneous in that it "was partly in form one on implied warranty rather than negligence." This is a rather technical objection to only parts "First" and "Second" of the seven-part main instruction and the only authority cited in support of the point are M.A.I. 25.02 and 26.01, the former being the form for breach of warranty of fitness for consumption and the latter being the seven-part negligence instruction for negligently furnishing a dangerous instrumentality. The "First" simply submitted to the jury that "defendant sold Aralen, Plaquenil and Triquin for human consumption," an undisputed matter in this case that would appear to be appropriate in either warranty or negligence. The "Second" submitted that the "products when sold by the defendant were products which would cause serious damage to the retina of the eyes in some individuals on long term therapy using said drugs in the manner and for the purposes intended." This does not fit either "First" or "Second" precisely of the warranty instruction, 25.02, nor does it precisely fit "Second" of the negligence instruction of 26.01, although it is closer to the latter than

the former and no doubt due to the nature of the product and the record here needed some adaptation. In any event neither "First" nor "Second" are the crux of the matter, the other five paragraphs admittedly follow negligence M.A.I. 26.01 and there is no objection to that part of the instruction. The negligence submitted and the crux of this case, as indicated throughout this opinion, is contained in supported "Third," "Fourth" and "Fifth."

"Third, defendant knew or should have known of such dangerous potentialities of said products; and,

"Fourth, neither the plaintiff nor her doctors knew, and by the exercise of ordinary care, they could not have known of such dangerous potentialities of said products; and,

"Fifth, defendant failed to give a timely and adequate warning to the doctor who was prescribing said drugs to plaintiff of such dangerous potentialities of said products."

Thus upon the ground or reason now assigned the instruction was not manifestly and prejudicially erroneous. Sterling Drug, Inc. v. Cornish, 370 F.2d l. c. 84–85.

■ A final assignment directed to the appellant's right to a new trial is that the court erred in overruling its objection and thereby giving its stamp of approval to certain argument by plaintiff's counsel. Appellant's counsel in arguing "the latest reports" and tests and claiming that retinal injury could not be detected "in these people that have this idiosyncrasy, you can't find it" finally said, in appealing to the jury: "The lupus—this lady, Charlie Gray says 'God rest Dr. Weiss' soul.' I say to you that Dorothy Krug and her sister should thank God that this drug was on the market because the lupus that is discoid at any time can turn into systemic and it's fatal." Respondent's counsel in painting his client's plight said, "Do you think at that time she raises her eyes to God and says,

'Thank God for Aralen?' Do you think she says that?" The latter is the statement objected to as prejudicial, but upon this record it would seem that there was a virtual standoff as to who should and who should not be grateful to the deity and the trial court did not abuse its discretion in refusing to grant a new trial upon this assignment. Douglas v. Twenter, 364 Mo. 71, 259 S.W.2d 353.

And, since there were no manifestly prejudicial matters entitling appellant to a new trial and no attempt to demonstrate a course of repeated improper conduct in defiance of the court's rulings there could be no new trial because of "the cumulative, prejudicial effect of the various errors." Myers v. Moffett, Mo., 312 S.W.2d 59; Bittner v. Crown Shoe Manufacturing Company, Mo.App., 340 S.W.2d 142, 151.

 The appellant Sterling's final point is that the trial court erred in refusing to hold that the verdict was excessive "and in failing to grant a new trial." The mere fact that a verdict is very large, even excessive, does not in and of itself demonstrate passion and prejudice, and it is the established practice in this jurisdiction to cure the error of excessive verdicts by enforced remittiturs (Joice v. Missouri-K.-T. Railroad Co., 354 Mo. 439, 453, 189 S.W.2d 568, 576, 161 A.L.R. 383) and the problem here is whether, adhering to the rule of uniformity and its attendant tests (Crane v. Northup, Mo., 413 S.W.2d 190; Parlow v. Carson-Union-May-Stern Co., Mo., 310 S.W.2d 877, 885), the verdict of $125,000.00 is excessive and should be reduced by remittitur. Needless to say this is a difficult problem and there are no fairly comparable Missouri cases cited, certainly none in recent years that have kept apace with increasing and "changing economic factors." Parlow v. Carson-Union-May-Stern Co., supra. The relevant cases over the years 1941 to 1950 involving eyes are collected in 16 A.L.R.2d 3, 130–136 and since 1950 in 2 A.L.R.2d later case service 1. c. 535–539,

and this reference alone is sufficient to indicate the impossibility of reconciling the cases.

In November 1965 Dorothy Krug was 43 and it is not necessary to recite all the inconveniences and frustrations attendant upon being, as Dr. Post said, "very close to being blind; she has to be led into a room. She sees light, she sees form, she is very badly off." She cannot watch television, she no longer attempts to read anything other than Braille. The medical testimony as to Dorothy's eyes is undisputed, as indicated, Dr. Bernstein said that she had "retinal degeneration" in both eyes, that the condition was permanent and irreversible. Both Doctors Sanders and Post described her condition in great detail after numerous examinations over the years, their opinions agreed with those of Dr. Bernstein. The appellant does not question the uncontradicted medical evidence, the appellant only says that Dorothy "still has some vision and her condition is static and in recent years there has not been too much change." In addition the appellant points to the fact that there is "no evidence of any lost time or salary" and she "is still at the same job as a laboratory technician" and is now earning more than when she started the drug. However, Dr. Ring of the Washington University Dental School said that the "quality of the (her) work has diminished considerably in recent years" and that she frequently makes mistakes, she has to be driven to work, bumps into walls and furniture, cries when unobserved and it was his final opinion that "The routine work varies from acceptable to unacceptable, but she formerly was a first-rate technician. *At the present time she would,* I think, *by our standards, be unemployable."*

 In this background and these circumstances the instances in 1950 and 1952 of blindness in one eye, even with other injuries, are not too helpful or persuasive. Meierotto v. Thompson, 356 Mo. 32, 201 S.W.2d 161; Stith v. St. Louis Public Service

Co., 363 Mo. 442, 251 S.W.2d 693, 34 A.L.R. 2d 972; O'Brien v. Louisville and Nashville R. Co., 360 Mo. 229, 227 S.W.2d 690. Excessiveness and uniformity is governed and controlled by local Missouri rules and decisions but inevitably in this particular case and its circumstances the federal cases have their force. In Sterling Drug, Inc. v. Cornish, supra, there was a jury verdict of $110,000.00 which had been remitted to $80,000.00 and the appellant did not question the size of the final verdict. In Yarrow v. Sterling Drug, the case was "tried to the Court sitting without a jury" and the trial judge awarded a mother and housewife, forty-eight years old, $80,000.00. The ultimate disposition of that case, January 1967, does not appear. Without further demonstration, it may not be said upon this record that the verdict is manifestly excessive and should therefore be reduced some definite amount.

## APPEAL OF BEAUMONT PHARMACY

As indicated, Dorothy Krug instituted and prosecuted her cause of action against Sterling Drug, the manufacturer, and Beaumont Pharmacy, the retail pharmacist who filled the innumerable chloroquine prescriptions. Upon the plaintiff's cause of action, at the close of all the evidence, the court sustained Beaumont's motion for judgment and directed a verdict against Dorothy. In the main action Beaumont filed a cross claim against Sterling to recover the attorneys' fees and expenses of $5,753.80 it had necessarily incurred in defending itself against Dorothy Krug. The cross claim was separately tried before the trial judge who found that Sterling was not liable for these expenditures and Beaumont has appealed from that judgment.

In its cross claim Beaumont alleged that Sterling had been negligent in selling its drugs without adequate warning and that in dispensing the drugs it had relied upon Sterling's representations. Sterling refused Beaumont's tender of the full defense of the principal action. It is not necessary to set forth the facts relating to the cross claim, it is sufficient to indicate Beaumont's theory of recovery upon this appeal. Beaumont states the question as whether "(i)n an action for common law or non-contractual indemnity, such as the cause of action stated by the cross claim in this case, can the indemnitee recover his attorneys' fees and expenses even though he was not held to be liable to the original plaintiff?" Beaumont concedes that there are no precisely applicable Missouri cases but argues that the basic theory of "an implied contract of indemnity," as expounded in the excellent opinion in Hunter v. De Luxe Drive-In Theaters, Mo.App., 257 S.W.2d 255, should be extended to permit recovery, as here, "by successful as well as unsuccessful defendants in comparable circumstances." In that case, however, Hunter was not only primarily liable to the original plaintiff, it was solely liable and the indemnitee had satisfied the plaintiff's judgment for Hunter's negligence in the sum of $3,259.00. It is interesting to note, however, that in that case as in other Missouri cases, when indemnity has been permitted attorneys' fees and expenses have been allowed as well as the principal sum. Other Missouri cases, cited by the parties, are listed here because they state the general rules of indemnity and on their faces are distinguishable from this appeal: Western Casualty & Surety Co. v. Shell Oil Co., Mo.App., 413 S.W.2d 550; Pierce v. Ozark Border Electric Co-operative, Mo., 378 S.W.2d 504; Ward v. City National Bank & Trust Co. of K. C., Mo., 379 S.W.2d 614; Union Electric Co. v. Magary, Mo., 373 S.W.2d 16; State ex rel. Siegel v. McLaughlin, Mo.App., 315 S.W.2d 499; McDonnell Aircraft Corp. v. Hartman-Hanks-Walsh P. Co., Mo., 323 S.W.2d 788; Woods v. Juvenile Shoe Corporation of America, Mo., 361 S.W.2d 694; Annotation 97 A.L.R. 2d 616. In the instances in which indemnity was allowed there was a prior express contract between indemnitee and indemnitor or there was vicarious liability (Inhabitants of Westfield v. Mayo, 122 Mass. 100, a

leading case) as in the principal and agent cases. And, of course, relief was denied in the instances of joint and concurrent negligence and ultimately that in essence may be the difficulty here.

■ But by analogy and from these cases Beaumont has distilled an ingenious argument based essentially upon the premise of Sterling's basic fault. Thus it is said that Beaumont brings its cross claim not because Dorothy was hurt by Sterling's fault "but because it (Beaumont) was harmed by Sterling's breach of obligations which it owed to Beaumont." Beaumont's contention need not be set forth in detail, it is said, however, that the manufacturer, in contrast to a mere retailer, was the only one in a position to know the product and how to defend it and that because of its misconduct Beaumont as indemnitee "has been *exposed to liability*" by the act of the indemnitor. The argument is interesting, persuasive in several respects but two or more cases from other jurisdictions cogently and compellingly answer all the questions presented by this particular record and appeal. In Rauch v. Senecal, 253 Iowa 487, 112 N.W.2d 886, the purchaser of a water heater sued the manufacturer, the jobber and supplier for injuries when the heater exploded. The jury found against the manufacturer but exonerated the jobber and supplier and the supplier in a cross claim tendered the defense of the action to the other parties and asked for its costs and attorneys' fees incurred in defending the principal suit. In the first place, the court held that the supplier could not recover from the jobber because the jobber "was adjudged free from negligence in the first action" and thus there was no wrong by the jobber which the supplier was compelled to defend. The general rules relating to indemnity and the recovery of expenses and attorneys' fees were set forth and it was pointed out that in determining whether the seller was defending its own negligent acts or those of the manufacturer was to be determined from "the charges of negligence against Senecal (the supplier) in the original suit." The original petition was carefully analyzed and there as in this case it was alleged that the supplier or retailer was negligent "(i)n failing to inform persons using the heater of its dangerous safety characteristics when operated according to the directions of the defendants". It was then pointed out and held that this was a direct charge of primary negligence against the supplier or retailer and, therefore, "a defendant who successfully defends against his own primary negligence, in part at least, may not recover his expenses as indemnity against a co-defendant who is found liable for negligence." The Iowa case was followed in a similar relationship when unodorized liquid gas exploded in a basement in Leingang v. Bottled Gas Corporation, 7 Cir., 332 F.2d 959, and both cases were fashioned from Fidelity & Casualty Co. of New York v. Northwestern Tel. Exch. Co., 140 Minn. 229, 167 N.W. 800. In her petition, insofar as material here, the plaintiff Krug alleged that Beaumont was liable to her because negligent in the following respects: that it "failed to inform itself by literature or by any other means of the dangerous qualities of said drugs and of the reasonable likelihood of said drugs causing injury to persons using the same" and that it "failed to inform itself of the injuries being caused by said drugs and failed to warn the medical profession or the public through advertisements or in any other manner of the danger of the further use of said products * * *." These plainly, as indicated by the Rauch and Leingang cases, are charges of primary negligence against Beaumont. It may well be, had Beaumont been held liable in one or more submitted respects, that it in turn would have been entitled to indemnity against Sterling, but as far as this record is concerned it was defending its own alleged acts of primary negligence

and that for the purposes of resolving this particular issue is the test.

For the indicated reasons the judgments are affirmed.

STOCKARD and PRITCHARD, CC., concur.

PER CURIAM:

The foregoing opinion by BARRETT, C., is adopted as the opinion of the court.

All of the Judges concur.